## Commonwealth *vs.* Terry L. Patterson.

Suffolk. September 8, 2000. - December 6, 2000.

Present: Marshall, C.J., Ireland, Spina, Cowin, & Sosman, JJ.

*Homicide. Robbery. Felony-Murder Rule. Joint Enterprise. Practice, Criminal,* Assistance of counsel. *Constitutional Law,* Assistance of counsel. *Conflict of Interest. Attorney at Law,* Conflict of interest.

Evidence at the trial of indictments for murder in the first degree, armed robbery, and possession of a dangerous weapon was sufficient to warrant the jury to conclude that the defendant knew that his joint venturer was armed. [772-773]

Evidence at a murder trial that the victim was shot five times in the head at close range was sufficient to make out extreme atrocity or cruelty. [773-774]

At a murder trial, the defendant did not demonstrate that his counsel was ineffective due to a conflict of interest by reason of counsel's earlier representation of the defendant's brother in an unrelated civil matter, nor was there anything about counsel's relationship with the brother that would have conflicted with the defendant's interests at trial. [775-777]

A defendant convicted of murder in the first degree demonstrated that, very early in his attorney's representation of him, it was evident that the attorney was the only witness who could refute a disputed version of the defendant's statement that the prosecution intended to offer at trial: the attorney's serving as trial counsel was a violation of Disciplinary Rule 5-102 (A), as then in effect, and constituted an actual conflict of interest that required a new trial be granted without the demonstration of actual prejudice. [777-781]

Indictments found and returned in the Superior Court Department on October 27, 1993.

The cases were tried before *James D. McDaniel, Jr.,* J., and motions for a new trial were heard by him.

*John H. Cunha, Jr.* (*Charles Allan Hope* with him) for the defendant.

*Paul B. Linn,* Assistant District Attorney, for the Commonwealth.

Sosman, J. The defendant, Terry L. Patterson, was found guilty of murder in the first degree, armed robbery, and possession of

a dangerous weapon. The defendant filed a motion for a new trial based on alleged extraneous influences on the jurors, which was denied. The defendant then filed another motion for a new trial, based on trial counsel's alleged conflict of interest and on alleged newly discovered evidence. That motion was also denied.

The defendant now appeals from his conviction and the denial of his motions for a new trial. We hold that the evidence was sufficient to support the convictions. However, because we agree with the defendant's contention that his trial counsel's conflict of interest deprived him of the effective assistance of counsel, we set aside the verdicts and remand the matter for a new trial.[1]

1. *Background.* We summarize the evidence at trial, viewed in the light most favorable to the Commonwealth. With respect to the claim that defense counsel had a conflict of interest, we supplement the trial evidence with the evidence submitted in support of the defendant's motion for a new trial. In the early morning hours of September 26, 1993, the body of Boston police Detective John Mulligan was discovered in his truck outside the Walgreens drug store on American Legion Highway in the Roslindale section of Boston. Mulligan had been shot in the head five times at extremely close range (estimated to be within two feet). On the morning of his murder, Mulligan had been working a paid security detail at Walgreens. A store employee leaving on break had seen Mulligan asleep in his truck at approximately 3:30 A.M. The same witness, on his return fifteen minutes later, saw Mulligan's bloodied face. When the employee was unable to rouse Mulligan, the police were summoned. Mulligan customarily carried his department-issued gun while working the Walgreens detail, but, when his body was inspected by the police, his holster was empty and his gun was missing. At trial, the Commonwealth's theory was that the defendant Terry Patterson and codefendant Sean Ellis had come upon the sleeping Mulligan and seized the opportunity to rob him of his service revolver. The prosecution proceeded on a theory of joint venture, arguing that either the defendant or Sean Ellis had shot Mulligan during the course of that robbery.

Based on information from neighbors, the police circulated a flyer with a description of a distinctive automobile seen in the area around the time of Mulligan's murder. This description

---

[1]We therefore do not need to reach the alternative grounds raised in the defendant's new trial motion.

eventually led police to Mark Evans, the defendant's brother, who had registered in his name a car matching the description mentioned in the flyer. The police came to Evans's home on Thursday, September 30, 1993, at which time Evans told the police that the car described in the flyer resembled a car registered in his name, but that the car was actually owned and used by his brother, the defendant, Terry Patterson.[2]

The morning after speaking with police, Evans contacted an attorney who was representing him on an unrelated civil matter. Evans made an appointment to see the attorney, and she suggested that Evans bring his brother to meet with her as well. Evans brought the defendant with him to a meeting with counsel on October 2, 1993. In the car on the way to that meeting, the defendant told Evans that he had been "there" with his friend Sean Ellis on the night of Mulligan's murder and that he had driven Ellis home.

When they arrived at the lawyer's office, the defendant and Evans met with her together. Evans relayed that the police had questioned him about the car and that he had told the police about the defendant's ownership of the car. Evans also recounted the defendant's statement to the effect that he (the defendant) had been at Walgreens that morning with Sean Ellis. Evans then told the attorney that the police wanted him to come to the station and give a statement. The attorney replied, in the defendant's presence, that Evans had nothing to worry about and that he should cooperate with the police and tell them the truth.[3] The attorney then met privately with the defendant. She undertook representation of the defendant and continued as his counsel through trial.[4]

The next day after this first meeting, the defendant and his attorney went to the police station and spoke with Detectives John Brazil and Dennis Harris. In that interview, the defendant admitted that he had been at Walgreens with his friend, Sean Ellis, on the morning of Mulligan's murder. The defendant told

---

[2]At trial, Evans explained that his name was on the registration because his brother could not obtain his own insurance.

[3]Evans did not give another statement to the police until October 4, 1993, by which time the defendant had already given his own statement to the police. Evans claims that, when he went to the station, he saw his brother's attorney in the reception area and asked her whether he himself needed a lawyer. The attorney told him he did not need a lawyer.

[4]The defendant is represented by new counsel on the present appeal.

the police that Ellis had gone into the store to buy diapers. The defendant first related that, after Ellis made his purchase, he drove Ellis home. After further questioning, the defendant stated that, at some point after Ellis's purchase at Walgreens, Ellis had said he wanted to smoke a marijuana "blunt." The defendant and Ellis drove around the corner to a dead-end street next to some woods.[5] The defendant told the police that the two of them then started walking back through the woods toward Walgreens to get a cigar with which to make the blunt. The defendant claimed, however, that he stopped to relieve himself and did not go all the way through the woods to the Walgreens parking lot. Detective Harris then accused the defendant of "shy[ing] away from the truth" about what had happened in the parking lot, but the defendant insisted that "nothing" had happened in the parking lot. Detective Harris asked the defendant if Ellis had asked him to do "something stupid," and recommended that he should not protect Ellis. Harris then asked, "Are you the triggerman?" The defendant replied, "No."

In late October, 1993, shortly after the defendant's arraignment, his lawyer received a copy of an affidavit that had been submitted in support of a search warrant application. That affidavit recounted a version of the defendant's October 3 statement that included one additional question and answer. As set forth in the affidavit, the interview concluded with Harris asking the defendant whether Ellis had been "the triggerman." The defendant had allegedly nodded in response.

When defense counsel received this version of the statement, she immediately informed the assistant district attorney, both orally and in writing (with a copy to Ellis's counsel), that that version was not accurate. Counsel stated that she had been present throughout the interview and that the defendant had never been asked whether Ellis had shot Mulligan. She further claimed that, if such a question had been asked of her client, she would have instructed him not to answer it.

In September, 1994, four months prior to trial, the defendant's lawyer and counsel for the codefendant Ellis each filed a motion to sever. In his motion, counsel for Ellis argued, inter alia, that introduction of Patterson's statement identifying Ellis as the "triggerman" would require severance under *Bruton* v. *United States*, 391 U.S. 123 (1968). As part of that argument, he also

---

[5]A witness had seen the defendant's distinctive car parked in that location at the time of Mulligan's murder.

pointed out that, if the statement were introduced at Ellis's trial, he would have to call the defendant's counsel as a witness to refute that version of the defendant's statement. In the defendant's own motion to sever, his attorney also pointed out that, if tried together, Ellis would call her to the stand to testify about the defendant's statement. The motions to sever were allowed.

At Patterson's trial in January, 1995, several witnesses testified to seeing two black men, one tall and thin and the other shorter and heavier, near Walgreens in the early morning of September 26, 1993. One of the witnesses had seen the taller man crouching by Mulligan's car while hiding his hands in his sleeves. She identified Ellis as the man she had seen crouching by the car.[6] There was no eyewitness identification of the defendant, although the evidence confirmed that the defendant was shorter and heavier than Ellis and that he would fit the general description of the man who had been seen with Ellis.

The prosecution introduced fingerprint evidence taken from the door of Mulligan's truck, consisting of four "simultaneous" prints (i.e., prints from separate fingers of the same hand made at the same time). The police witness opined, based on the location of the prints and the direction in which they had streaked, that the prints had been left by a hand closing the door. The officer further opined that, looking at three of the prints combined, there were sufficient points of comparison to identify the prints as the defendant's, although he acknowledged on cross-examination that his identification method using cumulative points of comparison from different fingers was not the standard method for fingerprint identification.

The prosecution also introduced consciousness of guilt evidence. The day after Mulligan's murder, the defendant moved the car from its customary parking location and left it at the home of Evans's brother-in-law. When the police located the car a few days later, they found that its appearance had been altered and its registration plate removed.

---

[6]There was also evidence linking Ellis to both the murder weapon and Mulligan's missing service revolver. Ellis's girl friend testified that, four days after the murder, Ellis had brought two guns to her apartment. The next day, a friend of Ellis retrieved the guns and disposed of them in a field near the home of Ellis's mother. The police retrieved the two guns from that location and confirmed that one of the guns was Mulligan's and the other gun was the one from which the fatal shots had been fired.

Detective Harris testified with respect to the statement the defendant had given the police. On direct examination, Harris testified that the final question posed to the defendant during the interview was, "Are you the trigger man or is Sean?" Harris testified that the defendant had responded by nodding his head and that he had then stood up and rolled his eyes toward the ceiling. On cross-examination, Harris clarified that he had asked the defendant two separate questions: the defendant had first been asked whether he was the "trigger man," to which he had responded, "No," and had then been asked whether Ellis was the "trigger man," to which he had nodded. Harris maintained throughout his testimony that the interview had included a final question about Ellis's involvement and that the defendant had nodded in response to that question.

The defendant's trial counsel did not testify as to her recollection of the contents of the defendant's statement to the police. The defendant did not testify. Therefore, there was no evidence offered to refute Detective Harris's assertion that the defendant had identified Ellis as "the triggerman."

The prosecutor's closing argument made use of this material from the alleged final question and answer in the defendant's statement. After pointing to the various inconsistencies between the defendant's version of events in his statement and the observations of the eyewitnesses, the prosecutor characterized the defendant's final answer as indicative of his realization that he had been caught:

> "Terry Patterson is boxed in. Each step, he's seen. Each step, each attempt to cover his tracks, is witnessed, despite his best effort. And now he is boxed in. What does he do when he's boxed in? He's asked, are you the triggerman or is Sean? And remember the detective. He nods his head. He stands up, and he looks at the ceiling and rolls his eyes. His final cut at it is to try and diminish his own responsibility. But it doesn't work."

The prosecutor's closing went on to explain how the defendant's attempt to blame Ellis for the murder would not detract from the defendant's own culpability as a joint venturer.[7]

2. *Sufficiency of the evidence.* The defendant contends that

[7]The prosecutor's opening statement had portrayed the defendant's alleged inculpation of Ellis in a similar fashion: "So his final cut at it, when confronted

there was no evidence that he had knowledge of Ellis's posses-sion of a weapon during the robbery of Mulligan and that he was therefore entitled to required findings of not guilty on the felony-murder and armed robbery charges. To be convicted on a theory of joint venture for a crime that has possession of a weapon as one of its elements, the joint venturer must be shown to have had knowledge that the principal perpetrator had a weapon. *Commonwealth* v. *Fickett*, 403 Mass. 194, 196-197 (1988). The defendant correctly points out that there was no direct evidence that he had such knowledge. However, knowledge that one's joint venturer is armed may be inferred from circumstantial evidence. *Commonwealth* v. *Kilburn*, 426 Mass. 31, 35 n.7 (1997), and cases cited. The evidence, viewed in the light most favorable to the Commonwealth, showed that the defendant and Ellis concocted a plan to rob Mulligan of his service revolver and that Mulligan was shot during the course of that robbery. The evidence also showed that the fatal shots had been fired from another gun (later linked to Ellis), not from the stolen service revolver. From such circumstances, the jury could reasonably conclude that the defendant would not undertake to rob an armed man unless he was either armed himself or knew that his joint venturer was armed. See *Com-monwealth* v. *Ferguson*, 365 Mass. 1, 9 (1974) (from "apprehen-[sion] that the intended victim might resist," jury could infer that defendant in planned robbery knew that other participants were armed).

The defendant also contends that, as to murder in the first degree by means of extreme atrocity or cruelty, the evidence of five shots to the head at close range, inflicted on a victim who may well have been asleep at the time, was insufficient to make out the requisite extreme atrocity or cruelty. A case of murder in the first degree based on extreme atrocity or cruelty can be made out by showing any one or more of the factors set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216 (1983). See *Com-monwealth* v. *Hunter*, 416 Mass. 831, 836-837 (1994). Here, the evidence showed that Mulligan had been killed by five shots to the head fired from within two feet away. Any one of the shots would have been fatal. They had, in combination, caused mas-sive brain damage. There was significant disproportion between

---

with all of this, he says, when asked, what happened, are you the triggerman or is Sean, he stood up, rolled his eyes and nodded, always trying to minimize his own involvement to the point of pointing the finger at Sean Ellis."

the means necessary to cause death and those used, as well as a significant number of extensive wounds. *Commonwealth* v. *Cunneen, supra* at 227. Where the evidence met at least two of the *Cunneen* factors, the evidence was sufficient to support a verdict of murder in the first degree on the theory of extreme atrocity or cruelty. The possibility that Mulligan may have been sleeping, and that he therefore might not have endured any conscious suffering, does not prevent the jury from finding extreme atrocity or cruelty based on other factors. See *Commonwealth* v. *Podlaski*, 377 Mass. 339, 348-349 (1979) ("suffering has never been an indispensable element of the crime of murder with extreme atrocity or cruelty").

3. *Ineffective assistance of counsel.* A defendant's right to effective assistance of counsel is guaranteed under both the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. *Commonwealth* v. *Martinez*, 425 Mass. 382, 387 (1997), citing *Commonwealth* v. *Hodge*, 386 Mass. 165 (1982). To be "effective," defense counsel must be "unhampered or unfettered in his professional responsibility to the accused. . . . A defendant is entitled to the untrammeled and unimpaired assistance of counsel free of any conflict of interest and unrestrained by commitments to others." (Citation omitted.) *Commonwealth* v. *Davis*, 376 Mass. 777, 780-781 (1978). To establish a claim of ineffective assistance of counsel due to a conflict of interest, the burden is on the defendant to "detail[] the precise character of the alleged conflict." *Commonwealth* v. *Martinez, supra* at 389, quoting *Commonwealth* v. *Davis, supra* at 781. If a defendant shows that his attorney had a "genuine" or "actual" conflict of interest, nothing more need be shown to establish that there has been a denial of the defendant's art. 12 right to the effective assistance of counsel. *Commonwealth* v. *Croken, ante* 266, 272 (2000), quoting *Commonwealth* v. *Shraiar*, 397 Mass. 16, 20 (1986). For purposes of our art. 12 analysis, the defendant does not have to show prejudice or adverse effect on counsel's performance stemming from that conflict.[8] *Id. Commonwealth* v. *Martinez, supra* at 388. *Commonwealth* v. *Hodge, supra* at 167-

---

[8]To show that an attorney's conflict of interest violated a defendant's Sixth Amendment right to counsel, the defendant must show that the conflict had some adverse effect on counsel's performance. *Cuyler* v. *Sullivan*, 446 U.S. 335 (1980). In *Commonwealth* v. *Hodge*, 386 Mass. 165, 169-170 (1982), we declined to impose such a requirement under art. 12.

168. *Commonwealth* v. *Davis*, *supra* at 781. If the defendant establishes that counsel had only a potential or "tenuous" conflict, there must be a further showing that that potential conflict resulted in some form of prejudice. See *Commonwealth* v. *Fogarty*, 419 Mass. 456, 459 (1995); *Commonwealth* v. *Walter*, 396 Mass. 549, 559 (1986), and cases cited.

a. *Simultaneous representation of Evans.* The defendant contends that his trial counsel had a conflict of interest stemming from what the defendant characterizes as dual representation of himself and his brother, who was called to testify by the prosecution. The defendant has not shown any conflict stemming from counsel's representation of Evans that would violate the defendant's right to the effective assistance of counsel.

"[W]e do not automatically infer a conflict from dual representation." *Commonwealth* v. *Martinez*, *supra* at 389. See *Commonwealth* v. *Walter*, *supra* at 554 & n.6 (conflict will not be inferred "simply from the existence of joint representation"). To the extent that the defendant's conflict theory relies on his counsel's earlier representation of Evans in an unrelated civil matter, the record does not indicate either the time period or the subject matter of that representation.[9] Thus, the defendant has not met his burden of "detailing the precise character of the alleged conflict" stemming from his attorney's representation of Evans on an unrelated civil matter. *Commonwealth* v. *Martinez*, *supra* at 389.

The defendant also contends that his attorney, in her initial meeting with himself and Evans, represented Evans in this same matter, thus raising an actual conflict of interest. Assuming, without deciding, that defense counsel did at that time "represent" Evans in the matter of the pending murder

---

[9]The defendant submitted an affidavit from Evans indicating that the attorney was "still [his] attorney in [his] other case with her" as of October 4, 1993, when he encountered the attorney at the police station. There is no evidence concerning whether defense counsel's representation of Evans on that unidentified civil matter was still ongoing as of the defendant's trial in 1995. When there has been some form of dual representation that would have posed a conflict, termination of the conflicting representation prior to the time of the defendant's trial will ordinarily "obviat[e] the risk of simultaneous representation." *Commonwealth* v. *Martinez*, 425 Mass. 382, 388-389 (1997). See *Commonwealth* v. *Fogarty*, 419 Mass. 456 (1995) (no conflict where associate of defense counsel ceased representation of prosecution witness prior to defendant's retaining defense counsel); *Commonwealth* v. *Smith*, 362 Mass. 782 (1973) (no conflict where defense counsel's representation of prosecution witness ended prior to defendant's trial).

investigation, she ceased any such representation by October 4, 1993, at the latest when, at the police station, she told Evans that he did not need a lawyer. From that point forward, Evans was not represented by the defendant's attorney (or by any lawyer) in this matter. Cessation of that ostensible representation of Evans well before the defendant's trial eliminated any potential conflict that might have impaired counsel's representation of the defendant.[10] See *id.* at 388-389; *Commonwealth* v. *Fogarty, supra*; *Commonwealth* v. *Smith,* 362 Mass. 782 (1973).

Nor has the defendant made a showing that any aspect of counsel's relationship with Evans — whatever it consisted of and whenever it ended — might have made her anything less than completely loyal to the defendant at trial. The customary conflict engendered by defense counsel's representation of a prosecution witness is that that representation might inhibit defense counsel from conducting vigorous cross-examination of the witness, or inhibit defense counsel from pursuing certain avenues of inquiry through that witness, or tempt counsel to disclose client confidences. See *Commonwealth* v. *Martinez, supra* at 389-391 (defense counsel was "potentially inhibited" in his cross-examination of the client-witness and improperly disclosed privileged information); *Commonwealth* v. *Hodge, supra* at 170 ("counsel's enthusiasm for [attacking the witness's credibility] might naturally be diminished by counsel's financial interest in maintaining a good relationship with the client-witness"). Nothing on this record suggests even the potential for such a problem with Evans as witness. Although called as a

[10]We also note that the defendant was not arraigned until October 28, 1993, several weeks after his attorney ceased any representation of Evans in the murder investigation. The defendant's Sixth Amendment and art. 12 rights to the effective assistance of counsel did not attach until that arraignment. *Commonwealth* v. *Simmonds,* 386 Mass. 234, 237-238 (1982), and cases cited. A claim of ineffective assistance of counsel cannot be predicated on an attorney's conflict of interest that ended before the right to counsel even attached. See *Commonwealth* v. *Jones,* 403 Mass. 279, 286-287 (1988). The fact that the right to counsel has not yet attached does not relieve counsel of the professional obligation to adhere to all applicable ethical rules prior to the client's arraignment. It merely means that deviation from those ethical rules prior to arraignment does not, by itself, deprive the defendant of his Sixth Amendment or art. 12 rights. If the ethical violation persists beyond arraignment, at which time the right to counsel attaches, such a violation may become the basis for an ineffective assistance of counsel claim. As discussed *infra* at 775, there is no showing that counsel's prior representation of Evans posed any conflict with her representation of the defendant after his arraignment.

prosecution witness, Evans's testimony was undisputed and largely cumulative of what the defendant had already admitted in his own statement. Cf. *Commonwealth* v. *Walter, supra* at 555-556 (noting that cases finding genuine conflict from simultaneous representation of prosecution witness involved witnesses who "gave evidence concerning a critical issue in the case against the defendant"). Moreover, even on his direct examination, Evans attempted to minimize the import of his brother's admission and to explain the alterations that had been made to his brother's car as innocent repair. Those parts of his testimony that were not merely cumulative of the defendant's statement were clearly helpful to the defense.[11] The defendant's interests would not have been served by any impeachment of Evans's credibility and thus, assuming that defense counsel still had any ongoing attorney-client relationship with Evans or any lingering sense of loyalty to Evans from a prior relationship, there was nothing about that relationship that would have conflicted with the defendant's interests at trial.

b. *Trial counsel as defense witness.* The defendant argues that a conflict of interest developed because it became apparent that trial counsel was the only witness who could refute the version of the defendant's statement that the Commonwealth intended to offer. We agree with the defendant that, very early in the representation, it became evident that his attorney should be called as a witness in his defense and that her continued representation of him beyond that point created an actual conflict of interest.

At the time of these events, S.J.C. Rule 3:07, Canon 5, DR 5-102 (A), as appearing in 382 Mass. 779 (1981), was still in

---

[11]Specifically, Evans had originally told the grand jury that the defendant's admission to being at Walgreens with Ellis that night had included the words, "I remember. Boom, bang. I remember being there." The prosecution suggested that the use of the words "[b]oom, bang" was indicative of the defendant's presence during the actual shooting. At trial, Evans testified (on direct examination and more emphatically on cross-examination) that the reference to "[b]oom, bang" was his (Evans's) own way of explaining that his brother had been using "slang" at the time. He testified unequivocally that his brother had not actually said the words "[b]oom, bang" at any time in their conversation. As to the car, Evans testified that the car was having "engine work" done, that the place to which the defendant had taken it to do this work was the same place he had used before for such repair work, and that some of the alleged changes in the appearance of the windows were not actually changes. Evans thus sought to explain that the removal of and changes to the car were not the product of any consciousness of guilt.

effect.[12] Disciplinary Rule 5-102 (A) required an attorney to withdraw as counsel if the lawyer learned or if it became "obvious" that the lawyer "ought to be called as a witness on behalf of his client."[13] See *Commonwealth* v. *Rondeau,* 378 Mass. 408, 414 (1979) (once it "became apparent to [defense counsel] that his testimony might be necessary to the proper defense of his client, he was ethically obligated to withdraw as counsel").

Here, trial counsel knew, for well over a year prior to the actual trial, that she had testimony concerning the disputed contents of her client's statement to the police. Because the only persons present at the defendant's interview were herself, the defendant, and the two officers who took the statement, counsel also knew that her own testimony would be the only means, short of the defendant's taking the stand (which he did not do), by which she could introduce evidence contrary to the police version of the defendant's statement.[14] Compare *Borman* v. *Borman,* 378 Mass. 775, 790 (1979) (unlikely that attorney

---

[12]As of January 1, 1998, S.J.C. Rule 3:07, Canon 5, DR 5-102 (A), as appearing in 382 Mass. 779 (1981), was replaced by Mass. R. Prof. C. 3.7, 426 Mass. 1303 (1998). The new rule prohibits a lawyer from acting as trial counsel "at a trial in which the lawyer is likely to be a necessary witness."

[13]Disciplinary Rule 5-102 (A) adopted the exceptions set forth in S.J.C. Rule 3:07, Canon 5, DR 5-101 (B), as appearing in 382 Mass. 779 (1981), thus allowing the attorney to continue the representation if the testimony related solely to an uncontested matter, to a matter of formality, or to the nature and value of legal services rendered, or if the withdrawal of the attorney would work a "substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case." DR 5-101 (B) (4). None of these exceptions is at issue in the present case.

[14]The statement had not been electronically recorded. The officers' version of the interview had been put in their report, but no written version had ever been presented to the defendant for his review and acknowledgment. We have noted that electronic recording of a defendant's statement is a practice with many potential advantages, even though not required as a matter of constitutional or common law. *Commonwealth* v. *Fernandes,* 427 Mass. 90, 98 (1998). *Commonwealth* v. *Diaz,* 422 Mass. 269, 272-273 (1996). We note here that, had the defendant's statement been recorded, the recording would have resolved whether any question had been asked concerning Ellis's involvement in the shooting, thus making his attorney's testimony unnecessary. Whenever defense counsel is present at a defendant's unrecorded interrogation, counsel will be a potential witness in the event of any future discrepancies concerning what was said during that interrogation and will become a necessary witness if any of those discrepancies take on significance to the defense. As in *id.* at 272, we note that the cost of acquiring and operating recording equipment is "minimal," and it is minute in comparison to the cost of the new trial that we must now order.

would need to be called as witness if client "could support his contentions by other means"). Thus, counsel's status as at least a potential witness was known within a few days of his arraignment when this discrepancy first appeared in a police affidavit.[15]

That defense counsel "ought" to testify concerning what transpired at her client's interview with the police soon became "obvious." DR 5-102 (A). Counsel immediately recognized the importance of the discrepancy between the police version and her own recollection of the defendant's statement and felt it necessary to communicate with the prosecutor, both orally and in writing, to point out the alleged inaccuracy in the police version of the interview. There is no indication that the police or the prosecutor ever acknowledged counsel's proposed correction, and it came as no surprise when Detective Harris testified at trial to the version of the statement that included the defendant's identification of Ellis as the actual perpetrator.

Detective Harris's version of the defendant's statement was clearly more damaging to the defendant than the version to which defense counsel could have testified. If, as the police contended, the defendant's statement had included his acknowledgment that Ellis was the "triggerman," such an acknowledgment on his part would immediately suggest that the defendant had been present at and witnessed the actual shooting, a position that would be directly contrary to his earlier claim that he had stayed in the woods and that "nothing" had happened in the Walgreens parking lot that morning.[16] At trial, the prosecution also used this final question and answer from the defen-

---

[15]Counsel's status as a potential witness was further highlighted in the motions to sever when Ellis's counsel announced that he would have to call the defendant's attorney as a witness if the police version of the defendant's statement were put before the jury in Ellis's trial. The motions to sever were submitted in September, 1994, four months prior to trial. As such, there was more than ample time in which to arrange for successor counsel. Nothing in this case raised the dilemma sometimes posed when counsel's need to testify only becomes apparent on the eve of or during trial. See DR 5-101 (B) (4) (allowing attorney witness to represent client at trial if withdrawal "would work a substantial hardship on the client") and Mass. R. Prof. C. 3.7 (a) (3) (same).

[16]In her closing argument, defense counsel pointed out to the jury that the defendant had seen Ellis a few days after the murder and that the defendant could have learned of Ellis's role in the shooting from some discussion with Ellis at that time. There was, however, no evidence that Ellis had ever made any such admission to the defendant or any evidence suggesting some reason why Ellis would make such an admission to the defendant. It remained a more

dant's statement as evidence that the defendant had recognized the futility of his continued denials. The defendant's accusation of Ellis was referenced in both the prosecutor's opening and closing as the defendant's final attempt to diminish his own culpability once he realized that he was "boxed in." While there was other substantial evidence against the defendant, police testimony to the effect that the defendant's statement ended with the defendant identifying Ellis as the "triggerman" was certainly damaging to the defense. Trial counsel's version of the interview, in which the interview terminated with the defendant's own denial of any involvement and contained absolutely no discussion of Ellis's role as the shooter, was of obvious importance to the defense.

Counsel's continued representation of the defendant beyond the point when it became obvious that she should testify for the defense was a violation of DR 5-102 (A).[17] This particular ethical violation constitutes a form of conflict of interest. *Commonwealth* v. *Rondeau, supra* at 414-415. The conflict lies in the fact that the client's interests would be better served by having the attorney testify while the attorney's interests would be better served by not testifying.[18] *Id.* at 415-416 & n.7. "[A] lawyer may not withhold crucial testimony from his client

likely explanation that the defendant's alleged knowledge of the identity of the "triggerman" was based on his own presence at the scene of the shooting.

[17]It had also become "likely" that counsel would be a "necessary witness," making her representation of the defendant at trial a violation of the current Mass. R. Prof. C. 3.7 and thus requiring withdrawal under Mass. R. Prof. C. 1.16 (a) (1), 426 Mass. 1369 (1998).

[18]Once the conflict has arisen, the attorney's decision to remain as trial counsel and forgo testifying cannot be justified as a legitimate strategic choice. The very problem with an attorney's conflict of interest is that the attorney's judgment about strategic choices is clouded by the conflict. Cf. *Commonwealth* v. *Michel,* 381 Mass. 447, 454 n.10 (1980) ("such decisions if made by counsel with divided loyalties are suspect because it is not possible to determine reliably to what extent the decisions were based on valid strategic considerations and to what extent the decisions were the result of impermissible considerations of the interests of other clients"). See Mass. R. Prof. C. 1.7 comment 4, 426 Mass. 1331 (1998) (conflict precludes representation when it "will materially interfere with the lawyer's independent professional judgment in considering alternatives"). Here, where trial counsel's own interests were best served by remaining as counsel and not testifying, she could not make an independent professional assessment of the strategic choices surrounding her own potential testimony. We note further that, on this record, there does not appear to have been any strategic benefit from defense counsel's decision to forgo testifying and leave the police version of her client's state-

because he prefers to continue as counsel." *Borman* v. *Borman, supra* at 790.

Under *Rondeau,* once the defendant has shown that his attorney should have withdrawn because of the likelihood that the attorney's testimony would be necessary, the defendant need not demonstrate any actual prejudice stemming from his attorney's failure to testify. *Commonwealth* v. *Rondeau, supra* at 415-416 & n.7. The demonstration of this particular form of conflict of interest is sufficient to establish that the defendant was denied the effective assistance of counsel. *Id.* Having made that showing here, the defendant is entitled to a new trial. Accordingly, the judgments are reversed, the verdicts set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*

---

ment unrefuted. The absence of any such strategic benefit makes it all the more likely that the decision to forgo testifying and remain as trial counsel was influenced by the attorney's conflict of interest.