COMMONWEALTH vs. MARK R. MOSHER.

Worcester. October 9, 2009. - January 27, 2010.

Present: MARSHALL, C.J., SPINA, COWIN, BOTSFORD, & GANTS, JJ.

*Conflict of Interest. Attorney at Law,* Conflict of interest. *Practice, Criminal,*
Continuance without a finding, Assistance of counsel, Argument by
prosecutor. *Evidence,* Relevancy and materiality.

A criminal defendant failed to demonstrate that he was denied effective as-
sistance of counsel at trial due to an actual conflict of interest arising from
his counsel's representation in an unrelated criminal matter of a witness
testifying for the prosecution, where counsel's representation of the wit-
ness ended more than one month before the defendant's trial commenced,
when the witness's criminal matter was continued without a finding, a
disposition that resolved the underlying case [818-823]; further, the defend-
ant failed to demonstrate that a potential conflict of interest arose from
counsel's representation of the witness, given that counsel had sound
reasons, unrelated to the prior representation, to decline to pursue a defense
strategy that would have depended on either implicating the witness in the
murder or attacking his credibility [823-826].
At a murder trial, defense counsel's failure to pursue two potential lines of
inquiry to implicate parties other than the defendant in the killing of the
victim did not constitute ineffective assistance of counsel, given the weak-
ness of the evidence and its tendency to undermine the primary defense
strategy [827-828]; moreover, counsel did not commit a serious failure in
representation by not calling a witness to testify to certain inadmissible
bad act evidence [828-829].
In the circumstances of a murder trial, a witness's reference in testimony to
the defendant's incarceration did not unfairly prejudice the jury. [829-830]
At a murder trial, two isolated passages of uncertain significance in the
prosecutor's extended closing argument, which the defendant alleged
improperly invited the jury to convict the defendant without finding that he
was the shooter, did not, without more, create a substantial likelihood of a
miscarriage of justice. [830-831]

INDICTMENTS found and returned in the Superior Court Depart-
ment on March 5, 1999.

The cases were tried before *Daniel F. Toomey,* J., and a mo-
tion for a new trial, filed on September 28, 2006, was heard by
*Dennis J. Curran,* J.

*Susan J. Baronoff* for the defendant.

*Ellyn H. Lazar-Moore,* Assistant District Attorney, for the Commonwealth.

GANTS, J. On February 11, 2000, a jury convicted the defendant of murder in the first degree based on deliberate premeditation, as well as related charges of home invasion and unlawful possession of a firearm. Represented by new counsel, the defendant appeals from his convictions and from the order of a Superior Court judge denying his motion for a new trial. On appeal, the defendant argues that (1) his trial counsel was burdened by an actual conflict of interest due to his ongoing representation on an unrelated matter of a witness testifying for the prosecution; (2) separate and apart from the conflict of interest, defense counsel's representation at trial was so woefully inadequate as to deprive the defendant of his right to effective assistance of counsel; (3) a witness's reference in testimony to the defendant's incarceration unfairly prejudiced the jury; and (4) the prosecutor's closing argument improperly invited the jury to convict the defendant without finding that he was the shooter. We affirm the defendant's convictions and find no basis on which to grant relief under G. L. c. 278, § 33E.

*The evidence at trial.* We summarize the facts the jury could have found from the evidence at trial, reserving certain details for our analysis of the issues raised on appeal. On the morning of December 22, 1998, David "Shorty" Tokarz (victim) was found dead in his West Brookfield home. When discovered, he lay on the floor, in rigor mortis, clothed in only a towel, having suffered three gunshot wounds. He had been shot twice through the towel: once in the hip and once in the abdomen. The entry and exit wounds from these two shots indicated that the bullets had traveled in a downward path through the victim's body as he stood and faced his assailant. The third gunshot wound was to his head, inflicted as the victim lay on the floor, wounded and bleeding from the first two shots; the barrel of the pistol was inside the victim's ear when the final shot was fired. An old, rusty, and inoperable shotgun lay just inside the door to the house, at the bottom of a set of stairs, and a splintered chunk of its wooden stock lay on the floor nearby. Because the victim's girl friend, Annette Broberg, testified that she had telephoned the victim at his home and spoken with him between 9:30 and 10 P.M. on December 21, and had telephoned him again between

11:30 P.M. and midnight, but received no answer, the victim likely was killed at some time between the two telephone calls.[1]

The key witnesses for the prosecution were James Osipov and Neil Potter, who each had been charged as an accessory before the fact to the victim's murder.[2] Both testified at the defendant's trial despite these pending charges. There was no evidence that any promises, rewards, or inducements had been offered or provided in return for their testimony.[3,4]

At the time of the murder, the defendant lived with Craig Bosse and Bosse's girl friend, Kimberly Martelli, at Martelli's home on South Street in Barre. Osipov testified that he was at the South Street residence in the early evening of December 21, drinking alcohol with the defendant and Bosse until about 7:30 P.M., when he went home. A short time later, the defendant telephoned him, and he returned to the South Street home, picked up the defendant, and drove him to Potter's home, which was approximately five minutes away. Both Osipov and Potter testified that, at the defendant's request, Potter gave the defendant a plastic bag containing a loaded .38 caliber revolver as well as a pair of "motorcycle" gloves.[5]

The defendant and Osipov then returned to Osipov's house. The defendant asked Osipov to inspect the revolver to ensure it was functioning properly, stating that it was best not to take "a broken sword into battle." Osipov put on the gloves that Potter

[1]This time frame is also roughly consistent with the testimony of the medical examiner, who arrived at the crime scene at approximately 1 P.M. on December 22, 1998, and found the victim in "full rigor." She opined that rigor mortis begins about two hours after death, is maximal at twelve hours, and declines after that. She declined, however, to offer any opinion as to time of death.

[2]James Osipov was also indicted as an accessory after the fact. Each was represented by separate counsel.

[3]Osipov testified that he had "asked for protection," but the defendant objected, and the testimony was struck. He also testified that he had been driven to court the last two days by the State police, but after objection, the judge told the jury that there was no protection component to this "taxi service."

[4]Both Osipov and Neil Potter pleaded guilty to the indictments against them after the defendant's trial and were sentenced to five years' probation.

[5]Neil Potter lived with his brother, Wayne Potter. Wayne testified that a few days before Christmas, he saw the defendant and Osipov arrive at the house in Osipov's truck at around 7:30 or 8 P.M. and that the two stayed about thirty minutes before leaving together.

had given the defendant, inspected the firearm in the driveway of his home, and returned the firearm and gloves to the defendant, informing him that the firearm looked operational.

Osipov then lent his old, beaten-up truck to the defendant. He testified that he had an idea what was happening and wanted nothing to do with it. The defendant drove the truck away, leaving Osipov at home, but returned in the vehicle approximately forty-five minutes later, with the only functional muffler on the truck ripped off, the tailpipe dragging, and the undercarriage scratched. The defendant told Osipov to take care of the dragging tailpipe, which Osipov did by wiring it up with a coat hanger. The defendant then left again in the truck.

He returned one hour later.[6,7] On his return, the defendant told Osipov that "the deed is done." The defendant explained that he had gone to see the victim, that the victim had come at him with a rifle, and that he had shot the victim twice in the chest. The defendant told Osipov that he had then bent down over the victim, told him, "See what that bitch did to you," and fired a bullet in the victim's ear.

Osipov then assisted the defendant in concealing evidence of the crime. Osipov took the clothes and sneakers the defendant had been wearing, doused them with gasoline, and burned them in a back yard cooking pit, and he provided the defendant with cut-off sweatpants and a sweatshirt to wear in their place.[8] He also helped the defendant wash his hands with turpentine to remove any residue that might have been left on him from firing the gun. Osipov asked the defendant what he had done with

---

[6]Osipov testified that it was a twenty- to thirty-minute drive to the victim's house from his house.

[7]Osipov's testimony as to the defendant's coming and going in the truck was corroborated in part by the testimony of his brother, Gregory Osipov. Gregory observed that James Osipov was upset and drunk when James entered the house they shared at approximately 7 P.M. on December 21, 1998. James then left the house. After James returned, Gregory heard the clicking of a firearm. Gregory later saw his brother's truck return to the driveway of the house, without a muffler. When Gregory came out to the yard, the defendant was there. The defendant said, "Bad karma," and asked him to go upstairs to get his brother. Gregory heard the truck return again one hour later. When Gregory went to bed around 11 P.M., his brother was not home.

[8]The State police examined this fire pit on December 31, 1998, and found charred remnants of shoelaces, rubber from the front of a sneaker, and small pieces of knitted clothing.

the firearm, and the defendant told him "[n]ot to worry about it.
It was gone."[9],[10] Osipov then took his brother's truck and drove
the defendant to the South Street residence, a distance of only a
few hundred yards, where the defendant changed into clothes of
his own.[11] Following the defendant's directions, Osipov drove
him to Worcester and dropped him off by a dirt road near an air-
port in Worcester. The defendant instructed Osipov to get rid of
the tires on the truck the defendant had driven.[12] On December
22, Osipov sold the truck to a scrap yard for $35.[13]

The defendant then walked to the residence of Roger LaPlante,
who lived in a secluded home off a dirt road near the Worcester
airport, arriving around 11 P.M. The defendant told LaPlante that
he and Bosse had had an argument and asked if he could spend
the night. The defendant slept on a couch in LaPlante's living
room on the nights of December 21 and December 22.

On the evening of December 23, the defendant told a friend
at a bar that the police were looking for him, that something
bad had happened, and that the friend might not see him for a
while. The defendant said that he was going to talk to the police
and that it would be better for the friend if he knew nothing
about what had happened.

The defendant slept at another friend's home in Rutland on
the nights of December 23 and 24. On Christmas morning, that
friend drove the defendant to downtown Worcester.[14] On the
morning of December 29, the defendant voluntarily appeared at
the State police barracks in Holden to give a statement to police.
The defendant told police that he had just learned of the victim's

---

[9]The firearm used in the victim's shooting was not located by police.

[10]After the defendant returned, Osipov did not see the gloves given to the
defendant by Potter.

[11]Police recovered the borrowed sweatpants and sweatshirt in a search of
the house executed on January 7, 1999.

[12]Impressions of the tire tracks found outside the victim's house were
examined by the Federal Bureau of Investigation laboratory. The parties
stipulated that, because of insufficient detail in those impressions, the labora-
tory was unable to reach a conclusion whether any of the impressions were
made by Osipov's truck.

[13]Police later recovered the vehicle from the scrap yard.

[14]The defendant told police he spent the intervening days in the Worcester
home of a woman he identified only as "Carol," but police were unable to
locate any woman living in the neighborhood he described who matched his
description of her.

death the previous evening when he had called Bosse to ask for a ride home from Worcester; he said that Bosse had told him that "the cops think you did it." He denied killing the victim. He told police that the victim was "a good guy" who "needed to come up with major league cash lately." He said that one morning during the first week of December, the victim had come with his dog to the defendant's home and demanded $3,500 that the defendant owed him. According to the defendant, "he was bullshit; he was talking to the dog." When the defendant told him he did not have the money, the victim told him to ask Bosse to sell his motorcycle and give the defendant the money from the sale. The defendant said he told the victim "to go home and get some sleep." The defendant offered the opinion that the victim was killed because "he owed somebody a lot of money."

In his statement, the defendant told police that on the night of December 21, he had spent part of the evening drinking with Bosse, Osipov, and Martelli at his home, and at some point departed with Osipov. He said that he was not sure if he and Osipov had gone to Osipov's house, but that he knew they had driven to Worcester in Osipov's red pickup truck, describing the older, dilapidated truck that Osipov had disposed of at the scrap yard. He said he had arrived at the home of his friend, Roger, in Worcester around 10 P.M.; he could not recall Roger's last name. He explained that "me and [Bosse] get on each other's nerves now, around Christmas. I just needed to get out of there." The defendant offered to take a polygraph test. At the end of the interview, the defendant told police that he had been wearing (and had not washed) the clothes he had on since the morning of December 21, and he invited the police to take the clothes into custody, which they did.

After taking his statement, police drove the defendant to his South Street residence. On December 31, following additional investigation, they returned to the residence and arrested the defendant for the victim's murder. As they escorted him from the house, the defendant put his finger to his lips and cautioned Bosse, "Remember, silence is golden."

The defense called one witness and presented the jury with two "demonstrations." The witness was the keeper of the records of the Hubbardston highway department, where Neil Potter

was employed in December, 1998. Potter had testified that, on the evening of December 21, 1998, he had been called in to sand the roads from 10 P.M. until 1 A.M. on December 22. The keeper testified that the records reflected that Potter was called in to work at 10:15 P.M. on December 22, not December 21. The records reflected that Potter did not work on the evening of December 21; nor was there any record of a storm that would have triggered the need to sand the roads.

In the first demonstration, the defendant attempted to place himself behind the wheel of Osipov's truck to show that he could not fit because of his girth, and therefore could not have driven Osipov's truck to and from the scene of the killing.[15] At the demonstration, the jury saw the defendant attempt, but fail, to put himself behind the wheel of the truck.

In the second demonstration, the defendant briefly left the court room, changed into the trousers he had been wearing during his interview with the State police on December 29, 1998, and returned to allow the jury to observe him. The purpose of the demonstration was to allow jurors to evaluate whether he had gained or lost weight in the fourteen months since the time of the shooting.

*Motion for a new trial.* The defendant, represented by new counsel, moved for a new trial on September 28, 2006, based on the same grounds he now raises on appeal. The motion judge, who was not the trial judge,[16] conducted an evidentiary hearing on April 23 and 24, 2008, in which the defendant's trial counsel, Theodore Harris, and Bosse testified. The judge denied the motion on August 31, 2008, in a memorandum of decision and order.

We summarize the relevant facts as found by the judge, supplemented with undisputed evidence from the record. Harris was appointed to represent the defendant on January 4, 1999, and represented him during pretrial proceedings, trial, and post-

---

[15]When the defendant was booked following his arrest on December 31, 1998, he reported that he was six feet, four inches tall and weighed 450 pounds. At trial, Bosse testified that, a few months before the victim's death, he, the defendant, and Osipov were attempting to use Osipov's truck to tow a Jeep out of a barn. According to Bosse's account, the defendant was too large to get behind the steering wheel of the truck, so Bosse had to drive.

[16]The trial judge had died before the motion hearing.

trial proceedings until February 7, 2001. The indictments against the defendant were returned on March 5, 1999. On June 3, 1999, Harris entered an appearance on behalf of Bosse in Worcester District Court, where three months earlier, Bosse had been charged with four misdemeanor offenses unrelated to the charges pending against the defendant. Bosse had asked Harris to represent him after the defendant had told Harris that his friend had a legal problem and that he was going to refer him to Harris. At a court hearing on December 14, 1999, all the charges against Bosse were continued without a finding for sixty days, until February 4, 2000. Bosse was placed on administrative probation during that period and required to return to court with a donation of $500 worth of children's toys.[17] Harris charged Bosse $1,500 for his services, which Bosse paid in full before the December 14, 1999, court appearance.[18]

*Discussion.* We accept as true the subsidiary findings of fact made by the motion judge absent clear error, deferring to the credibility findings of the judge, who had the opportunity to observe and evaluate the witnesses as they testified. See *Commonwealth* v. *Sparks*, 433 Mass. 654, 656 (2001), and cases cited. We find no clear error in those findings. We make our own independent determination on the judge's application of the law to the facts as found. See *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), *S.C.*, 398 Mass. 806 (1986).

1. *Actual conflict of interest.* The defendant argues that he was denied effective assistance of counsel at trial, in violation of State and Federal constitutional guarantees, because his counsel was burdened by an actual or genuine conflict of interest arising from his representation of Bosse. The defendant contends that, on February 1, 2000, when Bosse was called by the prosecution to testify in Mosher's murder trial, Harris's representation of Bosse had not concluded because the period of Bosse's administrative

[17]Bosse testified that he returned to court on the same day and made the required donation. The docket, however, reflects that the cases were not dismissed on the recommendation of the probation department until July 23, 2007, when proof of the donation was submitted. Bosse testified that he had to hire another attorney in 2007 to resolve the situation for him.

[18]Bosse testified that Harris charged him between $4,000 and $5,000, and that Bosse still owed money to Harris. The judge did not credit Bosse's testimony.

probation had three more days to run before the charges against him could be dismissed under the terms of the continuance without a finding. Consequently, the defendant asserts, Harris had a continuing obligation to Bosse that compromised his ability to provide "untrammeled and unimpaired assistance of counsel free of any conflict of interest." *Commonwealth* v. *Davis*, 376 Mass. 777, 780-781 (1978).

"Under the Sixth and Fourteenth Amendments to the Constitution of the United States and art. 12 of the Declaration of Rights of the Commonwealth, criminal defendants have a right to the assistance of counsel unimpaired by loyalties to other clients." *Commonwealth* v. *Fogarty*, 419 Mass. 456, 458 (1995). See *Glasser* v. *United States*, 315 U.S. 60, 75 (1942). Under Federal constitutional law, a defendant is entitled to a new trial if he establishes that his attorney had an actual conflict of interest and that this conflict "adversely affected his lawyer's performance." *Cuyler* v. *Sullivan*, 446 U.S. 335, 350 (1980). However, under art. 12, if a defendant establishes an actual conflict of interest, he is entitled to a new trial without a further showing; he need not demonstrate that the conflict adversely affected his lawyer's performance or resulted in actual prejudice. See *Commonwealth* v. *Shraiar*, 397 Mass. 16, 20 (1986); *Commonwealth* v. *Hodge*, 386 Mass. 165, 169-170 (1982). We require no further showing because, when an attorney has an actual conflict of interest, the effect of the conflict on the attorney's representation of the defendant is likely to be pervasive and unpredictable, while the difficulty of proving it may be substantial, "particularly as to things that may have been left not said or not done by counsel." *Commonwealth* v. *Hodge, supra* at 170, quoting *Commonwealth* v. *Cobb*, 379 Mass. 456, 461, vacated sub nom. *Massachusetts* v. *Hurley*, 449 U.S. 809 (1980), appeal dismissed, 382 Mass. 690 (1981). Where the defendant's counsel has labored under an actual or genuine conflict, therefore, we are unwilling to put a defendant "to the burden, perhaps insuperable, of probing the resolve and the possible mental conflict of counsel." *Commonwealth* v. *Cobb, supra.*

An actual or genuine conflict of interest, however, must be one in which prejudice is "inherent in the situation," such that no impartial observer could reasonably conclude that the attorney is

able to serve the defendant with undivided loyalty.[19] See *Commonwealth* v. *Epsom*, 399 Mass. 254, 262 (1987). See also *Commonwealth* v. *Shraiar*, *supra* at 20; *Commonwealth* v. *Davis*, *supra* at 782 (actual conflict of interest when counsel is "shackled or impaired by commitments to persons other than the defendant"). We have typically found that an actual conflict exists "where an attorney represents codefendants with inconsistent or contradictory lines of defense; where an attorney or an associate maintains an attorney-client or direct and close personal relationship with a material prosecution witness; or where an attorney has business reasons for preferring a verdict unfavorable to the defendant he or she represents." *Commonwealth* v. *Walter*, 396 Mass. 549, 554-555 (1986). The burden rests with the defendant to prove an actual conflict of interest. See *Commonwealth* v. *Soffen*, 377 Mass. 433, 437 (1979).

Where, as here, the defendant claims an actual conflict arising from his attorney's representation of a prosecution witness, we have found an actual conflict only where (1) at the time of trial, the defense attorney continued to represent a prosecution witness who furnished material testimony concerning a critical issue in the case against the defendant; or (2) the defense attorney had previously represented a prosecution witness in a matter related to the defendant's criminal case who furnished material testimony concerning a critical issue in the case against the defendant. See *Commonwealth* v. *Walter*, *supra* at 555-556, and cases cited. Compare *Commonwealth* v. *Martinez*, 425 Mass. 382, 392 (1997) (actual conflict where defense counsel engaged in ongoing representation of key prosecution witness at time of trial on unrelated criminal matters), with *Commonwealth* v. *Smith*, 362 Mass. 782, 783-784 (1973) (no actual conflict resulted from previously terminated representation of key prosecution witness on unrelated matter). See also *Commonwealth* v. *Geraway*, 364 Mass. 168, 183 (1973) (Tauro, C.J., and Braucher, J., dissenting) ("it should be noted that in all those cases where courts have

[19]Courts frequently consult standards laid out in applicable codes of professional ethics in considering whether an actual conflict exists. Here, we look to Mass. R. Prof. C. 1.7 (b), 426 Mass. 1330 (1998) ("A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests . . .").

found that defence counsel's prior representation of prosecution witnesses in 'unrelated' civil or criminal cases has resulted in a conflict of interest, there were *special circumstances*, such as the prosecution witness being the victim of the crime for which the defendant was charged, that indicated that the prior cases involving defence counsel *were not in fact* unrelated to the defendant's criminal trial").

Here, the second alternative does not apply because the criminal matters on which Harris represented Bosse had no relation to the criminal charges against the defendant. As to the first alternative, there is no dispute that Bosse was a prosecution witness who furnished material testimony concerning critical issues in the defendant's case. The question of actual conflict, then, rests on a single issue: whether Harris continued to represent Bosse when he testified at trial.

We conclude that Harris's representation of Bosse ended on December 14, 1999, more than one month before the defendant's trial commenced, when Bosse admitted to sufficient facts for a finding of guilt and the District Court judge issued an order continuing his case without a finding for sixty days. See G. L. c. 278, § 18. The defendant argues that, because Bosse's criminal charges were continued without a finding at the December hearing, his case remained technically "open" or "in suspense" when Bosse testified on February 1, 2000, in the defendant's trial. Therefore, the defendant contends, Harris's professional obligation to Bosse continued at least until February 4, 2000, when Bosse's period of administrative probation was scheduled to conclude.

The defendant's argument confuses a continuance without a finding, which constitutes a criminal disposition under G. L. c. 278, § 18, with a continuance under Mass. R. Crim. P. 10, 378 Mass. 861 (1979). A rule 10 continuance postpones a criminal proceeding, which necessarily leaves the pending charges unresolved. In contrast, when a judge resolves a criminal charge by ordering a continuance without a finding, the judge does not suspend the process of adjudication; rather, the judge resolves the underlying criminal charge and makes a "disposition." See G. L. c. 278, § 18 (defendant may make "dispositional request that a guilty finding not be entered, but rather the case be continued

without a finding to a specific date thereupon to be dismissed, such continuance conditioned upon compliance with specific terms and conditions or that the defendant be placed on probation"); *Commonwealth* v. *Powell*, 453 Mass. 320, 324 (2009) (G. L. c. 278, § 18, establishes statutory procedure "for the disposition of criminal cases by means of a [continuance without a finding], the imposition of conditions, and dismissal"). See also *Black's Law Dictionary* 539 (9th ed. 2009) ("disposition" is "final settlement or determination"). A rule 10 continuance admittedly shares a term with a continuance without a finding, but there the resemblance ends.

A continuance without a finding closely resembles a sentence of straight probation, except that the former is not a "conviction" under State law if the defendant successfully completes the period of probation or complies with the terms and conditions set by a judge. Compare *Commonwealth* v. *Villalobos*, 437 Mass. 797, 802 (2002) (admission to sufficient facts followed by continuance without a finding not "conviction" under Massachusetts law), with *Commonwealth* v. *Cory*, 454 Mass. 559, 566 (2009) (probation constitutes disposition of and punishment for crime). Both constitute dispositions that resolve the underlying criminal case. In both, in the absence of special circumstances, the defense attorney's work is completed once the disposition is obtained. While under either disposition a defendant may be sentenced to jail or prison if he should commit a new crime or otherwise violate a condition of probation during the probationary term, the attorney is not obliged to continue the representation simply for the purpose of advising the defendant to obey the law and comply with all applicable conditions.

Because Harris's attorney-client relationship with Bosse ended when the court disposed of the charges against Bosse by ordering a continuance without a finding under G. L. c. 278, § 18, Harris no longer represented Bosse when Bosse testified on February 1, and no actual conflict of interest arose in the course of his representation of the defendant at trial. See *Commonwealth* v. *Martinez*, 425 Mass. 382, 388-389 (1997) (termination of conflicting representation prior to defendant's trial will ordinarily "obviat[e] the risk of simultaneous representation"); *Commonwealth* v. *Smith*, 362 Mass. 782, 783 (1973) (no actual

conflict when attorney's representation of prosecution witness ended one day before trial).

2. *Potential conflict of interest.* Where no actual or genuine conflict exists, an attorney's personal interests or obligations may still give rise to a "potential" conflict of interest. See *Commonwealth* v. *Soffen*, 377 Mass. 433, 437 (1979) (potential conflict of interest is one where "a more tenuous conflict appears"). Because the range of interests and obligations that might conceivably give rise to a potential conflict is unlimited, the defendant carries a special burden "to prove, without mere conjecture or speculation, both the existence and the precise character of the alleged conflict of interest." *Commonwealth* v. *Allison*, 434 Mass. 670, 694 (2001). See *Commonwealth* v. *Soffen, supra* at 438. A defendant claiming ineffective assistance of counsel due to a potential conflict of interest will be entitled to a new trial only if he can establish "material prejudice" to his defense resulting from the alleged conflict. *Commonwealth* v. *Shraiar*, 397 Mass. 16, 20 (1986). See *Commonwealth* v. *Cobb*, 379 Mass. 456, 459 (1980), and cases cited.

The defendant argues that Harris's prior representation of Bosse compromised his representation of the defendant at trial because, due either to a residual sense of loyalty to Bosse or to his fear of eliciting evidence that might have jeopardized Bosse's administrative probation, or both, Harris refrained from introducing evidence that would have implicated Bosse in the victim's murder and, more broadly, from impeaching Bosse's credibility when he testified as a witness for the Commonwealth. Specifically, the defendant contends that a reasonable attorney not constrained by any commitment to Bosse would have offered evidence showing that, at the time of his death, the victim owed $60,000 to the Vigilante motorcycle club (motorcycle club). Bosse belonged to the motorcycle club and had once served as its sergeant-at-arms.

A lawyer free of any conflict to Bosse, however, would have recognized at least three formidable problems with pursuing this line of defense. First, the record does not reveal and the defendant has not identified any witness who would have offered admissible evidence of such a debt. The police reports reflected that, after the victim's death, two members of the motorcycle club told an acquaintance of Annette Broberg that the victim

had owed them $60,000 and they expected Broberg to pay the money now that the victim was dead. This information was classic hearsay; the police never confirmed from the supposed declarants that such a debt existed. We have given wide latitude to the admission of relevant evidence that a person other than the defendant may have committed the crime charged, and have permitted hearsay evidence of a third-party culprit that does not fall within a hearsay exception when, "in the judge's discretion, 'the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other "substantial connecting links" to the crime.' " *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 801 (2009), quoting *Commonwealth* v. *Rice*, 441 Mass. 291, 305 (2004). Under this standard, it is doubtful that the judge would have admitted this hearsay evidence had it been offered by the defendant.

Second, even if the judge would have admitted this hearsay evidence, there is no reason to believe that it would have helped the defendant; it might well have hurt him. The defendant lived with Bosse and also was linked to the motorcycle club, albeit not as closely as Bosse. In the home they shared at South Street, the police found motorcycle garb associated with the club, including clothing bearing Nazi insignias, which Harris believed to be so prejudicial to the defendant that he successfully moved in limine to prevent reference to these items at trial. The admission of hearsay evidence regarding the debt purportedly owed by the victim to the motorcycle club would have opened the door to admission of the photographs depicting these items and to an examination of the defendant's connection to the club. Moreover, any suggestion that Bosse was responsible for the killing had little to support it. There was no evidence that Bosse had left his South Street home on the evening of the defendant's murder. Osipov and Potter, and their respective brothers, all testified that the defendant, not Bosse, had visited their homes on the night of the murder. Consequently, if Harris had pointed an accusing finger at the motorcycle club with the intention of implicating Bosse, the effect would have been to implicate the defendant. In fact, introduction of the alleged debt would have provided a stronger motive for the defendant to have killed the victim than the prosecution had established. A tactical decision by counsel not to introduce evidence that is as likely to be inculpatory as

exculpatory will not support a claim of ineffective assistance of counsel. See *Commonwealth* v. *Thompson*, 431 Mass. 108, 121, cert. denied, 531 U.S. 864 (2000).[20]

Third, any effort to point to the motorcycle club and to Bosse as the culprits would have undercut Harris's argument that Osipov and Potter were the true killers, because there was no evidence that Osipov or Potter had any affiliation with the motorcycle club or that they had provided a firearm, transportation, or clothing to Bosse to assist him in committing the murder. Harris had compelling reasons to point to Osipov and Potter, rather than Bosse, as the true culprits. They had already admitted to substantial involvement in the murder, and there were numerous inconsistencies in their version of events that he seized on to suggest that they, and not the defendant, were responsible for the killing.[21] Moreover, Harris needed to attack their credibility, as they provided the only evidence directly tying the defendant to the murder.

Just as Harris had legitimate, tactical reasons to point an accusing finger at Osipov and Potter, he had legitimate, tactical reasons to refrain from attacking Bosse as a witness. At trial, Bosse was friendly to the defense and hostile to the prosecution. He met with Harris prior to trial but refused to meet with the prosecutor, and he acknowledged at the hearing on the motion for new trial that he was interested in helping the defendant if he could. Bosse's direct examination did not materially hurt the defendant. The most incriminating testimony he offered was that the victim had come to the South Street house a "couple of weeks before Christmas," trying to collect $3,200 from the defendant, and the defendant had responded by telling the victim to go home and get some sleep, and then slamming the door in

[20]We recognize that Bosse had once been married to the victim's girl friend, Annette Broberg, fathered one of her children, and continued to pay her child support. However, Broberg had been divorced from Bosse since 1988 and had married again (and was in the process again of divorce) prior to beginning her relationship with the victim. There was no evidence that Bosse was angry or upset with the victim because of his relationship with Bosse's former wife.

[21]Harris's alternate theory suggested that Osipov and Potter had acted on behalf of a third person, Mat Thorng. Harris attempted, with limited success, to introduce evidence tending to show that the victim was owed $20,000 by Thorng and that, in order to pressure Thorng to repay him, the victim had threatened to expose a money-laundering operation run by Thorng.

his face. The defendant said nearly the same in his statement to the police.

Harris's cross-examination of Bosse, however, elicited considerable evidence valuable to the defendant's defense: that the defendant had denied killing the victim; that Osipov, not the defendant, routinely used the phrase, "The deed is done"; that Bosse asked the defendant to give Osipov a key to the South Street house (which allowed Harris to suggest that Osipov had planted Osipov's clothing in the defendant's residence prior to execution of the search warrant); that the defendant could not fit in the driver's seat of Osipov's truck and therefore could not have driven it on the night of the murder; that Osipov carried two handguns in two shoulder holsters at all times (one of which was a .38 caliber pistol, which was consistent with the murder weapon); and that it was not unusual for the defendant to leave their South Street house for weeks at a time, which diminished the prosecutor's suggestion that the defendant's flight indicated his consciousness of guilt. If Harris, as the defendant now suggests, had attempted to impeach Bosse's credibility on the witness stand, he would have undercut this valuable testimony. In short, Harris had sound reasons, unrelated to the prior representation, to decline to pursue a defense strategy that would have depended either on implicating Bosse in the murder, directly or through his association with the motorcycle club, or on attacking his credibility as a witness. See *Commonwealth* v. *Patterson*, 432 Mass. 767, 777 (2000) (no prejudice when defense counsel declined to impeach witness he had previously represented when testimony "attempted to minimize" guilt of defendant and was "clearly helpful" to defense). See also *Commonwealth* v. *Edgerly*, 390 Mass. 103, 108 (1983) (no prejudice from declining to call witness defense counsel simultaneously represented on unrelated matters when witness was "likely to be counterproductive" rather than helpful to defendant). If Harris still felt "any lingering sense of loyalty" toward Bosse from the prior representation, it did not result in prejudice to Mosher at trial. See *Commonwealth* v. *Patterson, supra.*[22]

---

[22]The defendant does not allege that Harris refrained from impeaching Bosse to avoid making use of information Harris obtained through the attorney-client privilege during his representation of Bosse. See *Commonwealth* v. *Soffen*, 377 Mass. 433, 437-438 (1979) (constitutional guarantee of assistance of

3. *Other claims of ineffective assistance of counsel.* The defendant argues that, apart from any prejudice resulting from the conflict of interest he has alleged, Harris's representation of the defendant at trial fell so far below the standard of an ordinarily fallible lawyer that the defendant was deprived of the effective assistance of counsel. We examine the defendant's claim of ineffective assistance of counsel under G. L. c. 278, § 33E, which is more favorable to a defendant than the Federal or State constitutional standards. *Commonwealth* v. *Frank*, 433 Mass. 185, 187 (2001). We therefore review the record to determine whether there was a serious failure by trial counsel and, if so, whether the failure resulted in a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Harbin*, 435 Mass. 654, 656 (2002). See *Commonwealth* v. *Wright*, 411 Mass 678, 682 (1992) (error created substantial likelihood of miscarriage of justice if error was "likely to have influenced the jury's conclusion"). In doing so, however, we give trial counsel's tactical decisions due deference. *Commonwealth* v. *Harbin, supra.* Many decisions of defense counsel that are characterized in hindsight as errors may have been reasonable tactical or strategic decisions when made: decisions questioned on appeal "do not amount to ineffective assistance unless 'manifestly unreasonable' when undertaken" at trial. *Commonwealth* v. *Boateng*, 438 Mass. 498, 509 (2003), quoting *Commonwealth* v. *Johnson*, 435 Mass. 113, 133-134 (2001).

Apart from the claims of ineffective assistance of counsel he attributes to Harris's conflict of interest, the defendant argues that he was denied effective assistance of counsel by Harris's failure to pursue two potential lines of inquiry that would have supported the over-all defense strategy of implicating parties other than the defendant in the killing of the victim. First, the defendant complains that in his cross-examination of Annette Broberg, the victim's girl friend, Harris did not inquire about statements she made indicating that "two dark skinned males" had been responsible for the killing. John Tokarz, the brother of

attorney who is unimpaired and unrestrained by commitments to others is intended to prevent defendant's attorney from being hampered "by having acquired privileged information which inhibits him in his representation of the defendant"). Nor is there any evidence that Harris learned anything during his representation of Bosse that could have helped the defendant's defense.

the victim, told police investigators that Broberg had told him that she was present at the time of the killing and had seen the assailants before they blindfolded her. When questioned by police about this version of events, however, Broberg denied ever having made this statement. She told the police that she had not been present at the victim's home on the night of the killing and that, when she had spoken to John Tokarz about "two brown skinned men," she was only repeating a story that Bosse had passed on to her. The weakness of this evidence is clear from Broberg's unwillingness to stand by the story John Tokarz had attributed to her. Moreover, even if Harris could have found a means of introducing the possibility that two unknown, "dark-skinned" assailants might have been responsible for the killing, the effort invested in supporting this insubstantial alternative would have undermined his primary strategy of focusing on Osipov and Potter as the two likeliest culprits. For these reasons, we cannot say that Harris's decision to forgo this line of questioning was "manifestly unreasonable." See *Commonwealth* v. *Boateng, supra* at 509.

Second, the defendant argues that Harris committed a serious failure in representation by not calling Meghan Martone, who would have testified that Osipov had once offered to kill her boss. Martone had reported to the defendant's investigator that, in the fall of 1998, after hearing her complaints about her boss, Osipov had offered, "If you want anyone taken out, let me know, and I can knock them off for you." Although Martone subsequently refused to give the investigator a formal statement, Harris had caused a subpoena to be served to secure her appearance at trial. However, when Harris informed the court of Martone's anticipated testimony, the prosecutor objected to its admission, and the court sustained the objection. The defendant does not challenge this ruling on appeal, perhaps because the judge plainly did not abuse his discretion in refusing to admit this prior bad act evidence. See *Commonwealth* v. *Graziano,* 368 Mass. 325, 329-330 (1975) (while defendant may introduce evidence tending to show that crime was committed by another, "evidence should not be too remote in time or too weak in probative quality, and it should be closely related to the facts of the case against the defendant").[23]

---

[23]While Harris was barred from calling Meghan Martone to testify, he did

In sum, considering together all the alleged failures by trial counsel, including the potential conflict, we find that Harris's representation of the defendant at trial did not result in a substantial likelihood of a miscarriage of justice.[24]

4. *Testimony that the defendant was in jail at the time of trial.* The defendant claims that he was prejudiced when, in response to the prosecutor's question whether the defendant "still work[ed]" at a tractor cab manufacturing plant, Bosse answered, "Yeah. Well, he is in jail now." Aware of the potential implications of the question, the judge immediately directed the prosecutor to proceed to his next question, which he did. There was no motion to strike the testimony, nor did the judge provide the jury with a cautionary instruction. The defendant claims that, because the jury learned from Bosse that the defendant was in custody, he is entitled to a new trial.

It can be inferred from the record that the court reporter heard Bosse say that the defendant "is in jail now," but the judge, the prosecutor, and defense counsel did not. At a sidebar later during Bosse's direct examination, the judge said that Bosse had come "dangerously close to making a reference to [the defendant] being in jail," and asked the prosecutor if he had admonished the witness to refrain from such remarks. He then added that, if it came out, "we are probably going for a mistrial." The prosecutor said he would do whatever he could to avoid that outcome. Neither the prosecutor nor the defense counsel informed the judge that the reference had already been made. Because the record supports the conclusion that neither the judge, the prosecutor, nor defense counsel heard Bosse's remark that the defendant was "in jail," we can infer that the jury did not hear it either.

Even if the jury did learn that the defendant was in custody, however, the information would still not result in a substantial likelihood of a miscarriage of justice. We generally do not want a jury to learn of a defendant's pretrial custody and certainly do not want the jury to focus on it. See *Estelle* v. *Williams*, 425

ask Osipov on cross-examination about the alleged offer. Osipov said he did not recognize Martone's name or recall the conversation.

[24]We note that the judge, during his final jury instructions, declared that "the conduct of counsel during this trial was . . . of the highest level expected of attorneys in cases such as this." He thanked the prosecutor and defense attorney "for a very well-tried case."

U.S. 501, 504-505 (1976). Yet, we do not find that Bosse's single remark that the defendant was "in jail" at the time of the trial, even if heard by the jury, resulted in a substantial likelihood of a miscarriage of justice. When a defendant has been indicted for murder in the first degree, especially when, as here, the defendant is alleged to have shot the victim in the head at close range and then could not be found for more than one week, learning that the defendant is held in custody pending trial is not likely to have influenced the jury's verdict.

5. *The prosecutor's closing argument.* Finally, the defendant argues that in his closing argument the prosecutor impermissibly invited the jury to convict the defendant on a theory of joint venture liability that was not alleged in the indictment and not supported by the evidence at trial. The defendant bases his argument on two portions of the prosecutor's argument, neither of which triggered an objection, which we quote:

> "So is the argument now to you that, well, not only did Osipov actually put it in the ear, well, [Potter] must have helped him. [Potter] must have been there, too. If they did, did they do it on their own for purposes that [haven't] been produced by any of these witnesses? Or is it that they did it because this defendant wanted it done? I mean is that what you are going to conclude? That is not your evidence, though. But it is interesting the control this defendant had over a number of these people. Seemed to be controlled."

Then, twenty-two pages later in the trial transcript:

> "So, Osipov was there and did it, or was with this man [the defendant] when it was done, or this man did do what Osipov says. Those three are the options, okay. Osipov was there and did it himself, [the defendant] was there with Osipov when it happened, or [the defendant] did it and came back and told Osipov what he did."

The prosecutor's remarks are not a model of lucidity, and extracting them from their context does not enhance their clarity. Still, we think it unfair to construe them as introducing an argument that the defendant did not himself shoot the victim, but aided and abetted Osipov or Potter (or both). We understand the

first passage, taken in context, to ridicule Harris's argument to the jury that Osipov had actually committed the murder, possibly with the assistance of Potter. The prosecutor lays out Harris's theory only to dismiss it: "That is not your evidence, though." We understand the second passage to set forth the prosecutor's explanation of the three alternatives to which the jury were logically limited in explaining how Osipov knew the details of the killing. Nothing in the prosecutor's argument encourages the jury to find the first two possibilities ("Osipov was there and did it" or "was with this man [the defendant] when it was done"). Rather, the gist of his argument is that, based on the evidence, the jury reasonably must conclude that only the third possibility described what had actually happened: "[The defendant] did it and came back and told Osipov what he did."

Two isolated passages of uncertain significance in an extended closing argument do not, without more, create a substantial likelihood of a miscarriage of justice. "We analyze the remarks 'in light of the entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.' " *Commonwealth* v. *Mello*, 420 Mass. 375, 380 (1995), quoting *Commonwealth* v. *Marquetty*, 416 Mass. 445, 450 (1993). Here, the judge gave no joint venture instruction to the jury in his charge, and he specifically excluded such an option when he instructed them that they must acquit the defendant "unless you also are persuaded beyond a reasonable doubt that the defendant was the person who committed the acts comprising the elements of the crimes of which he is accused." Considering the totality of the circumstances, the prosecutor's closing argument did not result in a substantial likelihood of a miscarriage of justice.

6. *Review under G. L. c. 278, § 33E.* In addition to considering the defendant's specific claims on appeal, we have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E. We discern no error, considered alone or in conjunction with the defendant's claims of error, that produced a substantial likelihood of a miscarriage of justice. Nor, in view of the circumstances of this case, do we find any reason to reduce the murder verdict to a lesser degree of guilt.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*