APPEALS COURT 
 
 COMMONWEALTH vs. RONALD BADGETT

 
 Docket:
 24-P-239
 
 
 Dates:
 April 9, 2025 – November 3, 2025
 
 
 Present:
 Ditkoff, Singh, & Smyth, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Firearms. Constitutional Law, Assistance of counsel. Due Process of Law, Assistance of counsel. Practice, Criminal, Assistance of counsel, Plea, New trial, Waiver. Waiver. Attorney at Law, Conflict of interest, Attorney-client relationship. Conflict of Interest.
 
 

             Indictments found and returned in the Superior Court Department on April 24, 2017. 
            Motions for a new trial, filed on April 21, 2020, and October 12, 2022, were heard by Sharon E. Donatelle, J. 
            Estera Halpern for the defendant.
            Mackenzie Slyman, Assistant District Attorney, for the Commonwealth.
            SMYTH, J.  On February 15, 2018, the defendant, Ronald Badgett, pleaded guilty to three firearms charges.  In this consolidated appeal from two orders denying his motions for a new trial, the defendant, who is Black, argues that his counsel's bias against Black persons created a conflict of interest violating his constitutional right to the effective assistance of counsel.  Because counsel's bias created an actual conflict of interest that was not validly waived by the defendant, we reverse.
            Background.  On April 24, 2017, indictments issued charging the defendant with four firearms offenses[1] and two habitual offender enhancements.  The defendant was appointed counsel and arraigned on May 22, 2017.  After the defendant requested new counsel, on September 25, 2017, Richard Doyle was appointed as successor counsel to represent the defendant.
            In September 2017 -- the same month that Doyle began representing the defendant -- the Committee for Public Counsel Services (CPCS) commenced an investigation into a complaint against Doyle and reviewed Doyle's social media page, on which he had made and shared "numerous racist and bigoted public postings" expressing his hatred of and scorn for persons of the Muslim faith, Black persons, undocumented immigrants, and transgender persons.[2]  See Commonwealth v. Dew, 492 Mass. 254, 256-258 (2023).  Doyle also referred to his clients as "thugs[3] and bad guys" and punks, and he used other demeaning language indicating his disdain for his nonwhite clients, "suggesting that [they] were criminals."[4]  See id. at 258 & n.13.  The posts reviewed by CPCS were made by Doyle "from at least 2014 through 2017," overlapping in part Doyle's representation of the defendant.  Id. at 257.  After investigating Doyle in 2017, CPCS concluded that Doyle had violated his duty of loyalty to his Muslim and nonwhite clients and suspended him for one year.  Id. at 259.
            On December 27, 2017, the defendant signed a choice of counsel form electing to continue to have Doyle represent him.  The form stated that the CPCS investigation found that Doyle had a bias against, inter alia, "people who do not appear to be Caucasian (white)" and that Doyle had "an actual conflict and should not ethically represent people in these groups"; the form also stated that Doyle was contesting these findings.  The form stated that the defendant was "entitled to have . . . other counsel assigned to represent [him] at no cost."  The form did not describe the possible advantages and disadvantages of either option.[5]
            In February 2018, the defendant, through Doyle, reached an agreement with the Commonwealth to enter a plea of guilty on three of the four firearms charges; a judge conducted a plea colloquy with counsel for the Commonwealth and Doyle present.  Doyle failed to appear for the subsequent sentencing hearing on March 2, 2018; a different attorney was appointed to represent the defendant when the sentence was imposed.
            The defendant filed two "motions for new trial," in 2020 and 2022,[6] requesting that he be allowed to withdraw his guilty plea, both of which were denied.  We focus on the defendant's argument, raised in his second motion for a new trial, that he was denied the effective assistance of counsel because his attorney's racism towards Black persons constitutes an actual conflict of interest.  The motion judge contrasted Dew, 492 Mass. at 266, where the Supreme Judicial Court concluded that there was an actual conflict of interest for the same attorney's prejudice, with this case, noting that in Dew and unlike here, Doyle's prejudice "manifested" in his interactions with that client.  The motion judge found that the defendant did not meet his burden to demonstrate an actual conflict of interest because the defendant did not allege sufficient outward manifestations of racial bias.  In the absence of an actual conflict, the motion judge did not reach the issue whether the defendant waived such conflict.
            Discussion.  1.  Standard of review.  "We review the denial of a motion for new trial 'only to determine whether there has been a significant error of law or other abuse of discretion.'"  Commonwealth v. Indrisano, 87 Mass. App. Ct. 709, 719 (2015), quoting Commonwealth v. Acevedo, 446 Mass. 435, 441 (2006).  In reviewing a ruling on a motion for a new trial, we "conduct our own independent review of the documentary evidence and constitutional issues."  Commonwealth v. Drayton, 479 Mass. 479, 480 (2018).  "Where a genuine conflict of interest exists [between a defendant and his counsel], the defendant's conviction must be reversed."  Commonwealth v. Shraiar, 397 Mass. 16, 20 (1986).
            2.  Effective assistance of counsel.  The right to counsel guaranteed to criminal defendants by the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights is a "fundamental component of our criminal justice system."[7]  United States v. Cronic, 466 U.S. 648, 653 (1984).  The assistance of counsel is "the means through which the other rights of the person on trial are secured."  Id.  "Given the primacy of counsel towards the realization of fair proceedings and a fair trial in our adversarial system, the constitutional guarantee entitles an accused person 'to the untrammeled and unimpaired assistance of counsel free of any conflict of interest and unrestrained by commitments to others' and other causes."  Dew, 492 Mass. at 263, quoting Commonwealth v. Hodge, 386 Mass. 165, 167 (1982).  Thus, "under art. 12, if a defendant establishes an actual conflict of interest, he is entitled to a new trial without a further showing; he need not demonstrate that the conflict adversely affected his lawyer's performance or resulted in actual prejudice."[8]  Commonwealth v. Mosher, 455 Mass. 811, 819 (2010).
            "An actual conflict [of interest] is 'one in which prejudice is "inherent in the situation," such that no impartial observer could reasonably conclude that the attorney is able to serve the defendant with undivided loyalty.'"  Commonwealth v. Brown, 494 Mass. 326, 335-336 (2024), quoting Mosher, 455 Mass. at 819-820.  Under Mass. R. Prof. C. 1.7 (a), as amended, 490 Mass. 1303 (2022), "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest."  Such a conflict exists where "there is a significant risk that the representation of one . . . client[] will be materially limited . . . by a personal interest of the lawyer."  Id.  See Mosher, supra at 820 n.19 ("Courts frequently consult standards laid out in applicable codes of professional ethics in considering whether an actual conflict exists").  See also Brown, supra at 336.  "The analysis whether an actual conflict arose is case-specific."  Dew, 492 Mass. at 263 n.22.
            a.  Racial bias.  In Dew, the Supreme Judicial Court held that Doyle harbored "animus against persons of the Muslim faith" and "racism against Black persons" such that his representation of Dew, a Black, Muslim man, presented an actual conflict of interest.  Dew, 492 Mass. at 266.  The court based its holding on Doyle's social media posts expressing "vitriolic hatred of and bigotry against persons of the Muslim faith . . . matched only by [Doyle's] equal scorn for and racism against Black persons," id. at 254-255, as well as his treatment of Dew.  See id. at 268 (Doyle "ordered [Dew] to stop wearing his religious garb and refused to meet with [him] . . . upon seeing that the defendant was wearing his kufi").
            This case presents the issue not reached in Dew:  whether Doyle's racist beliefs, as evidenced by his social media posts, present an actual conflict of interest in the absence of any outward manifestations of his racial bias in his treatment of this particular defendant.  See Dew, 492 Mass. at 266 n.27.  We conclude that they do.  As in Dew, some of Doyle's social media posts appear to have been made during his representation of the defendant.  See id. at 257-258.  And all of his racist social media activity as described above was visible to the public during Doyle's representation of the defendant.[9]  Doyle's posts reflect extreme racial bias towards Black persons and specifically derogate Black men charged with firearms offenses.  Id. at 257-258 & nn.10-13.  The record shows a "pattern of posts reflecting the intensity of Doyle's bias," id. at 266, intensity that "cannot be squared with race-neutral decision making."  Ellis v. Harrison, 947 F.3d 555, 563 (9th Cir. 2020) (Nguyen, J., concurring), quoting S.L. Johnson, J.H. Blume, & P.M. Wilson, Racial Epithets in the Criminal Process, 2011 Mich. St. L. Rev. 755, 786 (2011).
            Here, where the defendant was a Black man charged with firearms offenses, "we cannot presume zealous advocacy."  Dew, 492 Mass. at 267.  See Brown, 494 Mass. at 336.  In these circumstances, we do not read Dew to require evidence of overt racism towards this defendant to prove the existence of an actual conflict.  See Dew, supra at 268 (evidence of Doyle's treatment of Dew "more than met" defendant's burden to show actual conflict of interest [emphasis added]).  The intensity of Doyle's bias as exhibited in his social media posts and comments would preclude an impartial observer from reasonably concluding that Doyle was able to serve the defendant with undivided loyalty.  See id. at 267 n.29, quoting Mosher, 455 Mass. at 819-820.[10]  See also Mosher, supra at 820 n.19, quoting Mass. R. Prof. C. 1.7 (b), 426 Mass. 1330 (1998).
            We arrive at this result with the acknowledgment that "[p]ublic confidence in the integrity of the criminal justice system is essential to its ability to function."  Dew, 492 Mass. at 269 (Cypher, J., concurring), citing Georgia v. McCollum, 505 U.S. 42, 49 (1992).  The flagrant racism and bigotry displayed in Doyle's social media posts necessarily affect not only Doyle's clients, but also the perception of justice in the wider community, especially for members of groups targeted in Doyle's bigoted posts.
            b.  Waiver.  "In those instances where an actual conflict of interest is established, the defendant may consent to continued representation by his attorney so long as his consent is voluntarily, knowingly, and intelligently made" (quotations and citation omitted).  Commonwealth v. Perkins, 450 Mass. 834, 853 (2008).  This waiver of the conflict "must be clear and unambiguous."  Id. at 854, quoting Commonwealth v. Martinez, 425 Mass. 382, 392 (1997).  The rules of professional conduct require counsel to confirm the client's consent in writing.  Mass. R. Prof. C. 1.7 (b).  However, "[t]he requirement of a writing does not supplant the need for the lawyer to talk with the client, to explain the risks . . . of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns."  Comment 20 to Mass. R. Prof. C. 1.7.  The client should be "fully advised of the import and ramifications of any such conflict."  Perkins, supra at 852.
            In Perkins, defense counsel agreed with a production company to wear a wireless microphone during trial; this created an actual conflict of interest because it exposed attorney-client communications to public view.  Perkins, 450 Mass. at 854.  There, the defendant's conflict waiver was valid because counsel "zealously and diligently protected the defendant's rights by informing the defendant, in detail, about the . . . production and its potential disadvantages."  Id.  The defendant's conduct also demonstrated his awareness of the conflict and the possible consequences.  Id. at 855.
            By contrast, nothing in this record indicates that the defendant was informed even of the extent of Doyle's racial bias, including the existence and contents of Doyle's online posts, not to mention the import and ramifications of the defendant's waiver.  The choice of counsel form signed by the defendant stated only that CPCS had investigated and substantiated a complaint that Doyle had "a bias against . . . people who do not appear to be Caucasian (white)."  The form also provided that Doyle was contesting these findings, and the defendant avers that Doyle told him that the allegations were false.  Instead of "informing the defendant, in detail," about the conflict, Doyle denied the existence of any conflict.  Perkins, 450 Mass. at 854.  There is no indication in the record, or even a suggestion, that Doyle discussed the risks and relative advantages of proceeding with Doyle as opposed to obtaining new counsel.[11]  We cannot say that Doyle "zealously and diligently protected the defendant's rights" in this case.  Id.  The choice of counsel form was not signed voluntarily, knowingly, and intelligently and was therefore inadequate to waive the conflict of interest.[12]  As a result, the defendant is entitled to a new trial.  See Martinez, 425 Mass. at 394.[13]
            Conclusion.  The order entered February 6, 2024, denying the defendant's motion for a new trial, is reversed.  The defendant's convictions are vacated, and the defendant is to be permitted to withdraw his guilty plea.  The case is remanded to the Superior Court for proceedings consistent with this opinion.
So ordered.
 
 
 
            [1] Possession of a firearm without a license, G. L. c. 269, § 10 (a); unlawful possession of a large capacity feeding device, G. L. c. 269, § 10 (m); possession of ammunition without a license, G. L. c. 269, § 10 (h) (1); and carrying a loaded firearm without a license, G. L. c. 269, § 10 (n).
            [2] We set forth the Dew court's description of some of Doyle's racist posts below:
"1.  A shared post of a poster for the movie 'The WaterBoy,' with the name and face of Colin Kaepernick, a Black football player and civil rights activist;
"2.  A shared post of a collage of three photographs —- one of Black men wearing shirts with the words, 'Trump & Republicans Are Not Racist,' one of a Black man in a 'Make America Great Again' hat, and one of two Black men wearing cowboy hats and a shirt and bandana with the confederate flag —- captioned, '5 minutes after Trump legalizes weed in all 50 states'; and
"3.  A shared post of two photographs, one depicting Black men posing with guns captioned, 'Don't glorify shooting people,' and the other showing distraught Black men captioned, 'Then cry like a bitch when someone you love gets shot.'"
Commonwealth v. Dew, 492 Mass. 254, 258 n.10 (2023).  The Supreme Judicial Court noted that Doyle's "own words best capture[d] the depth of his bigotry."  Id. at 257 n.8.
            [3] As noted by the court in Dew, "[t]he term 'thug' has been described by one linguist as a 'nominally polite way of using the N-word.'"  Dew, 492 Mass. at 258 n.12, quoting The Racially Charged Meaning Behind the Word "Thug," NPR (Apr. 30, 2015), https://www.npr.org/2015/04/30/403362626/the-racially-charged-meaning-behind-the-word-thug [https://perma.cc/34K5-VD4C].
            [4] For example, in a comment describing his work defending an Italian national, Doyle wrote,
"Happy ending for a harmless old man whom wouldn't swat a mosquito," followed by the comment, "I can walk away from this one without feeling dirty.  Doesn't happen much."  To another person's comment, "U love bathing in the filth, as long as it's green," Doyle responded, "Hell yeah."
            In another comment, Doyle wrote of a client who was found not guilty for a firearms charge:
"I just saved years off the kid's ass.  Between you and me, he should stop gang-banging.  He spent 7 months in the can until today."
            Doyle also wrote in a post:  
"[A] 21 y.o. punk client told me:  'I don't like your attitude, Doyle.'"  In a series of comments to the post, Doyle wrote, "I told him to come back with a new lawyer or a toothbrush," and said he would give the client "soap on a rope for a going away present."
See Dew, 492 Mass. at 258 n.13.
            [5] The record does not reveal who drafted the form.  As discussed further infra, it appears the plea judge, the same judge who ruled on the motions for a new trial, was not made aware that the defendant had reviewed and signed this form.
            [6] The defendant did not learn about Doyle's postings until he had completed serving his sentences.  Doyle died in March 2021, before the defendant filed his second motion for a new trial alleging Doyle's conflict of interest.
            [7] The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  The right to counsel is also guaranteed by art. 12 of the Massachusetts Declaration of Rights, which provides, in pertinent part, that "every subject shall have a right . . . to be fully heard in his defense by himself, or his counsel at his election."  The Supreme Judicial Court has "often noted that art. 12 provides 'greater safeguards' than those provided by the Sixth Amendment."  Dew, 492 Mass. at 261 n.17, citing Commonwealth v. Hodge, 386 Mass. 165, 169 (1982).
            [8] "By contrast, under the Sixth Amendment, a defendant must show that an actual conflict adversely affected counsel's representation."  Commonwealth v. Brown, 494 Mass. 326, 335 (2024).  The more protective art. 12 approach "avoid[s] putting a defendant in the untenable position . . . of probing the resolve and the possible mental conflict of counsel, a burden difficult to prove, particularly as to things that may have been left not said or not done by counsel" (quotations and citation omitted).  Id.
            [9] As noted above, the CPCS investigation uncovered these posts within the same month that Doyle was appointed as the defendant's counsel.
            [10] Because we hold that Doyle's posts established an actual conflict of interest, we need not reach the defendant's contention that Doyle's actions, including his failure to investigate and prepare for the motion to suppress and his absence from the defendant's sentencing hearing, were manifestations of Doyle's bias towards the defendant.
            [11] The record does not reflect that any attorney other than Doyle discussed the form with the defendant.
            [12] No party requested that any judge hold a colloquy on the subject of the conflict waiver.  Accordingly, we have no other evidence to demonstrate whether the defendant's purported conflict waiver was valid, given the lack of information provided to him by Doyle and the choice of counsel form that understated the facts.  See Perkins, 450 Mass. at 853-857.  A colloquy would have allowed the judge to ensure that the defendant was fully informed of his constitutional right to an attorney free of divided loyalties and that he understood the nature of the conflict.  See id. at 856, and cases cited (colloquy "constitutes the best practice for ensuring a client's consent to his attorney's conflict of interest"); Martinez, 425 Mass. at 392-393.
            [13] Because the defendant is entitled to a new trial due to his attorney's actual conflict of interest, we need not reach the defendant's other arguments.