NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12252

COMMONWEALTH  vs.  JOSEPH COUSIN.


Suffolk.     September 5, 2017. - January 11, 2018.

Present: Gants, C.J., Lenk, Gaziano, Lowy, Cypher, &
Kafker, JJ.


Conflict of Interest. Attorney at Law, Conflict of interest.
    Practice, Criminal, Assistance of counsel.



Indictments found and returned in the Superior Court
Department on September 4, 2002.

The cases were tried before Nancy Holtz, J., and a motion
for a new trial, filed on March 1, 2013, was heard by Janet L.
Sanders, J.

The Supreme Judicial Court granted an application for
direct appellate review.


Amanda Teo, Assistant District Attorney (David J. Fredette,
Assistant District Attorney, also present) for the Commonwealth.
    Robert F. Shaw, Jr., for the defendant.


LOWY, J.  Following a jury trial in the Superior Court, the

defendant, Joseph Cousin (Cousin), was convicted of murder in

the second degree.  Cousin filed a motion for a new trial,

claiming that his trial counsel was ineffective because he was burdened by an actual conflict of interest. A Superior Court judge granted Cousin's motion for a new trial. The Commonwealth appealed, and we allowed its application for direct appellate review.[1] The issue before this court is whether Cousin presented sufficient evidence to establish that his trial counsel was burdened by an actual conflict of interest. Although Cousin has set forth the basis for what may well constitute a potential conflict of interest, we conclude that he failed to meet his burden of demonstrating that his trial counsel was operating under an actual conflict of interest. Therefore, we vacate the allowance of Cousin's motion for a new trial and remand the case to the Superior Court for further proceedings to determine whether there was a potential conflict causing prejudice that would warrant a new trial.

1. Prior proceedings and background. We briefly indicate the nature of Cousin's criminal case, followed by a summary of the facts pertinent to Cousin's conflict claim, as they were found by the judge. We also reserve certain facts for later discussion.

Following an investigation by the Boston police department

_____

[1] The Commonwealth also moved for reconsideration of the motion judge's decision and to reopen the evidence. Following a hearing on that motion, the judge issued an amended memorandum but otherwise declined to reopen the evidence or reconsider her decision.

(BPD) homicide division, Cousin and another man were charged with murder for the shooting death of a young girl.  In 2004, Cousin and his codefendant were tried jointly for the murder, and the jury acquitted the codefendant.  The jury were deadlocked concerning Cousin, and eventually a mistrial was declared.  In Commonwealth v. Cousin, 449 Mass. 809, 815-816, 823 (2007), cert. denied, 553 U.S. 1007 (2008), we determined that double jeopardy did not bar Cousin's retrial because the prosecutor's inquiry into the jurors' criminal records during deliberation was not government misconduct intended to goad the defendant into moving for a mistrial.

Cousin was retried for the murder in 2009, and was represented by Attorney William White (White).  Cousin was convicted of murder in the second degree, and he was later sentenced to life in prison.  His direct appeal from his conviction to the Appeals Court has been stayed pending the outcome of this case.

In the meantime, Cousin, represented by new counsel, moved for a new trial, arguing that White was burdened by an actual conflict of interest.  The primary grounds for the alleged actual conflict were the involvement of White and his former law firm in two Federal civil rights lawsuits.  Specifically, White and his former law partners defended members of the BPD who were accused of misconduct in the course of other, unrelated criminal

investigations.

The judge, who was not the trial judge, held three days of evidentiary hearings before granting Cousin's motion. We present the pertinent facts she found in her written memorandum of decision and order.

a. White and the Federal civil rights cases. White joined the law firm of Davis, Robinson & White (DRW) as a partner in the early 1990s. DRW was comprised of three partners: White, Willie Davis, and Frances Robinson. White concentrated primarily on criminal defense, and he and Robinson intermittently represented police officers in disciplinary and administrative hearings. An attorney for the Boston police patrolmen's union occasionally referred police discipline cases to Robinson; however, there was no indication that Robinson or DRW had a formal contractual relationship with the patrolmen's union, the BPD, or the city of Boston (city).

DRW was organized as a limited liability partnership. The partners did not share profits or fees, and each partner earned only the money he or she generated. The partners generally worked independently on cases, particularly their criminal matters. The partners did, however, share common overhead expenses and office resources. Occasionally, the DRW partners would meet to discuss their cases. However, there is no indication that these informal discussions involved the

disclosure of confidential client information.

White left DRW in early 2007 and formed his own law firm, William White & Associates (White & Associates).  Several years thereafter, White operated White & Associates in office space he rented in the same building as DRW; however, his firm was neither connected to, nor was his practice affiliated with, DRW. At the hearing on Cousin's motion, White testified that after he left DRW, his former partners only referred him a limited number of civil litigation matters.  In January, 2009, the same year as Cousin's second trial, White relocated his firm to a different office building in Boston.

Cousin's claim that White was burdened by an actual conflict of interest focused primarily on the involvement of White and Robinson in two Federal civil rights cases, Drumgold vs. Callahan, U.S. Dist. Ct., No. 04-11193-NG (D. Mass. 2004) (Drumgold), and Cowans vs. Boston, U.S. Dist. Ct. No. 05-11574-GGS (D. Mass. 2005) (Cowans). The plaintiffs in the Drumgold and Cowans cases alleged that BPD homicide investigators had committed acts of police misconduct that led to their erroneous convictions, which were later overturned.  Cousin's motion relies heavily on the purported similarities between the police investigations underlying the Drumgold and Cowans cases and his own.

i.  Robinson's involvement in the Cowans case.  The judge

found that Robinson represented Rosemary McLaughlin, a member of BPD's latent fingerprint unit, who was a named defendant in the Cowans civil rights lawsuit.

Stephen Cowans was convicted of a shooting, in part based on fingerprints that were recovered from the crime scene and that McLaughlin, and another member of BPD's latent fingerprint unit whose work McLaughlin verified, matched to him.[2] Several years later, items from the crime scene underwent deoxyribonucleic acid (DNA) testing. The testing revealed that Cowans's DNA was not present on any of the items. A further internal investigation also revealed that a latent fingerprint recovered from the crime scene had been erroneously individualized to Cowans. Based on this investigation, in 2004, the Commonwealth joined in Cowan's motion for a new trial and the conviction was vacated.

Following his exoneration, Cowans filed the Federal civil rights lawsuit seeking damages against the BPD and certain officers involved in the investigation, including McLaughlin. Robinson filed her notice of appearance on behalf of McLaughlin on April 5, 2006.[3] Cowans's complaint alleged that McLaughlin had discovered but concealed the fact that his fingerprints had

---

[2] The full factual background of that case is set forth in Commonwealth v. Cowans, 52 Mass. App. Ct. 811, 812-813 (2001).

[3] The record is unclear concerning how Robinson came to represent McLaughlin.

been erroneously matched to the those recovered at the crime scene. The claims against McLaughlin focused exclusively on her involvement in Cowans's investigation and did not implicate her conduct in other investigations. Robinson represented McLaughlin until the Cowans case was resolved in September, 2007. Although the city paid the settlement in the Cowans case, it did not pay for Robinson's defense of McLaughlin.

ii. White's involvement in the Drumgold case. White's involvement in the Drumgold litigation began in 2006, while he was a partner at DRW. White represented two of the BPD officers named in the Drumgold case in succession -- a detective and then Lieutenant Timothy Callahan.

Shawn Drumgold was convicted of murder in connection with the 1988 shooting death of a twelve year old girl.[4] After Drumgold had been convicted and sentenced, he filed several motions for a new trial, seeking to have his conviction overturned on numerous grounds, including that members of the BPD had coerced witnesses into implicating him in the shooting. There also were claims that BPD officers failed to provide exculpatory evidence by not disclosing favorable treatment given to a prosecution witness. The Commonwealth's assessment of the investigation concluded that Drumgold had not received a fair

---

[4] The full factual background of that case is set forth in Commonwealth v. Drumgold, 423 Mass. 230, 233-235 (1996).

trial, and his conviction was vacated in 2003.

In 2004, Drumgold filed the Federal civil rights lawsuit, claiming that the BPD officers involved in his investigation engaged in coercive tactics, pressured witnesses to give favorable testimony, and withheld exculpatory evidence, leading to Drumgold's erroneous conviction. Drumgold also claimed that the BPD encouraged such conduct. The city, as one of the named parties, retained its own counsel, but hired White to represent the detective in his individual capacity. White was later hired to represent Callahan after the detective had been dismissed from the lawsuit. The city had agreed to pay for the legal defense of the detective and Callahan pursuant to an indemnification agreement. Although that agreement was not produced as part of Cousin's motion for a new trial, White testified that he had charged the city for his time representing the detective and Callahan on an hourly basis, at an agreed rate. White would submit monthly bills to the city for its review and payment. Over the course of White's representation of the detective and Callahan, the city paid White more than $310,000 for his work. White testified that despite being compensated by the city for representing the detective and Callahan, he fully recognized that his only clients were the two officers, and his loyalty toward them was undivided.

In January, 2008, the detective was dismissed from the

lawsuit.  Because White had been involved in discovery and the litigation in general, White testified that the city asked him to represent Callahan.  White filed his notice of appearance on behalf of Callahan on January 29, 2008.  Although White was listed as a lead attorney on the docket, he testified that he was not "asked to become the lead counsel for Callahan."  An attorney who had been the lead counsel representing Callahan maintained her position, and she assigned tasks to White.  When White began representing Callahan, he had already left DRW and was practicing at White & Associates.

The judge noted that the course of the Drumgold litigation and the nature of the lawsuit indicated that the interests of the city and the individual defendants were aligned.  In the same way that the city had indemnified the individual defendants for their legal fees, the city also would be responsible for paying any judgment or settlement arising from the claims of misconduct against the individual officers.  The judge observed that even though the city had separate counsel, its liability was contingent on the liability of the individual defendants. Further, the judge noted that White had worked closely with the city while defending both the detective and Callahan, as evinced by the defendants' multiple joint filings and the conduct of the

litigation.[5]

   Concerning the structure and mechanics of the Drumgold
trial, a judge in the United States District Court for the
District of Massachusetts ordered that the trial be divided into
three phases.  The first phase would address the liability of
the individual officers, including Callahan.  The second phase
would address the liability of the city and the BPD.  If the
jury determined that there was a constitutional violation in
either of the first two phases, then the third phase would
address damages.  The first phase of the trial took place in
March, 2008, where White participated in defending Callahan.
The jury found that Callahan was liable for one of the civil
rights claims against him, relating to his failure to disclose
that he gave "substantial amounts" of money to a witness for the
Commonwealth.  The parties then agreed to conduct the damages
phase of the trial concerning the money Callahan had given to
the witness, but the jury were unable to reach a verdict.  On
March 31, 2009, the judge ordered a retrial that was
specifically limited to Callahan's conduct regarding the
witness, which was scheduled for September, 2009.[6]

---

   [5] In October, 2007, counsel for the respective defendants,
including White, filed summary judgment motions on behalf of
their clients.

   [6] The scope of BPD Lieutenant Timothy Callahan's retrial was
limited to whether he intentionally or recklessly withheld

White did not participate in the Callahan retrial because, at that point, he was representing Cousin, whose criminal trial also was scheduled for September, 2009.  Although White did not participate in the Callahan retrial, he did not move to withdraw from the representation or otherwise remove himself from the case.  White testified that he was open to returning to represent Callahan if there was more work to be done on the Drumgold litigation after Cousin's case concluded.

b.  White's representation of Cousin.  White was appointed to represent Cousin in 2008.  Davis, White's former law partner at DRW, had represented Cousin during his first trial.  After the appeal concerning Cousin's mistrial concluded, Davis withdrew as Cousin's counsel and recommended that White be appointed as successor counsel.[7]  White was no longer working at DRW at this time and he did not have a referral relationship with his former firm.  Cousin initially indicated that he intended to retain private counsel for his second trial, but after meeting White in the Nashua Street jail, Cousin agreed to

_____

evidence from prosecutors about "(1) the fact that [the witness] was housed at a hotel and provided with meals; (2) that there were promises of favorable treatment in [the witness's] pending criminal cases; and (3) that money was given to [the witness]." Drumgold v. Callahan, 806 F. Supp. 2d 405, 408 (D. Mass. 2011), overruled on another ground, 707 F.3d 28 (1st Cir. 2013).

[7] White testified that Davis's recommendation that he take over the Cousin's defense was spurred by a chance encounter between White and Davis, where they talked briefly about the case.

have White represent him. Based on the testimony of White and Cousin at the hearing on the motion for a new trial regarding this meeting, the judge concluded that White did not provide sufficient information to Cousin about his representation of a police officer in the Drumgold case to allow Cousin to make an informed choice about choosing White as his attorney.

Much of Cousin's claim that White was operating under an actual conflict of interest depended on the similarities he alleged between his case and the Drumgold and Cowans cases.

The judge found that on June 29, 2002, the victim was shot and killed while playing at a park in the Roxbury section of Boston. The perpetrator fired the fatal shot from a vehicle that was in the vicinity of the park. Cousin's fingerprints were recovered from the exterior of that vehicle. Additional fingerprints were also recovered from the vehicle. Several of those fingerprints were individualized to two other individuals, including Cordell McAfee; other fingerprints were not initially matched to any individual. The same fingerprint analyst who examined fingerprints in the Cowans case also examined the fingerprints recovered from the vehicle, and McLaughlin verified the reports that the analyst generated. Shortly before Cousin's second trial, Rachel Lemery, another forensic examiner with the BPD latent fingerprint unit, reviewed those fingerprint reports. Based on her analysis of other fingerprints recovered from the

vehicle in 2002, Lemery was able to match those fingerprints to Daryl Richardson, a match that the previous analyst had failed to make before Cousin's first trial.[8]  It was likely that Richardson's fingerprint could have been matched in 2002, because Richardson was convicted of a crime in 1998, and thus his fingerprints were likely on file.

The Richardson fingerprint match also is applicable to Cousin's claim that the lead detective in his case, Daniel Keeler, engaged in misconduct leading to Cousin's conviction. Specifically, Cousin contended that Keeler had used coercive techniques during his interrogation of Cordell McAfee, whose fingerprints had been found inside the vehicle and whose recorded statement implicated Cousin and his codefendant.  The issue with McAfee's recorded statement was that at least the first hour was not recorded, and Keeler did not take notes or generate a report summarizing the interview.  Further, at Cousin's first trial Keeler admitted that, prior to activating the recording device, McAfee had been shown certain photographic arrays that included photographs of Cousin and his codefendant and had not identified either individual.  Moreover, McAfee confessed that he had been in the vehicle during the shooting,

---

[8] Rachel Lemery conducted a review of the fingerprints that the other analyst had analyzed and that McLaughlin had verified after the other analyst and McLaughlin had been removed from the BPD latent fingerprint unit.

along with two men named "Daryl" and "Man." Cousin claimed that Keeler had coerced McAfee into changing his story while off tape and then recorded only McAfee's inculpatory statements.

2. _Discussion_. We review the disposition of a motion for a new trial "to determine whether there has been a significant error of law or other abuse of discretion. . . . When, as here, the motion judge did not preside at trial, we defer to that judge's assessment of the credibility of witnesses at the hearing on the new trial motion, but we regard ourselves in as good a position as the motion judge to assess the trial record" (citations omitted). Commonwealth v. Grace, 397 Mass. 303, 307 (1986). "While we will not disturb a judge's subsidiary findings which are warranted by the evidence, 'ultimate findings and conclusions of law, particularly those of constitutional dimensions, are open for our independent review.'" Commonwealth v. Walter, 396 Mass. 549, 553-554 (1986), quoting Commonwealth v. Mahnke, 368 Mass. 662, 667 (1975), cert. denied, 425 U.S. 959 (1976).

a. _Actual conflict of interest_. The Commonwealth contends that the judge erred in concluding that White was burdened by an actual conflict of interest while representing Cousin. Specifically, the Commonwealth asserts that White's involvement in the Drumgold litigation and his former partner's representation of McLaughlin in the Cowans case, whether

considered in isolation or in the aggregate, did not amount to an actual conflict. We agree. Although Cousin identifies certain aspects of White's representation that are concerning, and may implicate a potential conflict of interest, Cousin has failed to meet his burden of adducing sufficient, nonspeculative evidence to establish that White was burdened by an actual conflict of interest.

"Under the Sixth and Fourteenth Amendments to the Constitution of the United States and art. 12 of the Declaration of Rights of the Commonwealth, criminal defendants have a right to the assistance of counsel unimpaired by loyalties to other clients." Commonwealth v. Mosher, 455 Mass. 811, 819 (2010), quoting Commonwealth v. Fogarty, 419 Mass. 456, 458 (1995). This bedrock constitutional guaranty "is intended to prevent a defendant's attorney from being hampered by contemporaneous divided loyalties or by having acquired privileged information which inhibits him in his representation of the defendant." Commonwealth v. Soffen, 377 Mass. 433, 437-438 (1979). If a defendant establishes an actual conflict of interest under art. 12, "he is entitled to a new trial without a further showing; he need not demonstrate that the conflict adversely affected his lawyer's performance or resulted in actual prejudice." Mosher,

supra. See Commonwealth v. Hodge, 386 Mass. 165, 169-170 (1982).[9]
No further showing is required because "the effect of the
conflict on the attorney's representation of the defendant is
likely to be pervasive and unpredictable, while the difficulty
of proving it may be substantial, 'particularly as to things
that may have been left not said or not done by counsel.'"
Mosher, supra, quoting Hodge, supra at 170.

An "actual" or "genuine" conflict of interest exists where
the "independent professional judgment of trial counsel is
impaired, either by his own interests, or by the interests of
another client" (quotations omitted). Commonwealth v. Shraiar,
397 Mass. 16, 20 (1986).  An actual conflict infects the
defendant's representation to the point where "prejudice is
'inherent in the situation,' such that no impartial observer
could reasonably conclude that the attorney is able to serve the
defendant with undivided loyalty."  Mosher, 455 Mass. at 819-
820, quoting Commonwealth v. Epsom, 399 Mass. 254, 262 (1987).
In determining whether such a conflict exists we look to the
standards set forth in the applicable codes of professional
ethics.  Mosher, supra at 820 n.19. See Mass. R. Prof. C. 1.7,

_____

[9] It is well established that art. 12 of the Massachusetts
Declaration of Rights provides broader protection than the Sixth
Amendment to the United States Constitution, which only entitles
a defendant to a new trial if an actual conflict and prejudice
is established.  Compare Commonwealth v. Hodge, 386 Mass. 165,
169-170 (1982), with Cuyler v. Sullivan, 446 U.S. 335, 350
(1980).

as appearing in 471 Mass. 1335 (2015).[10]

Given that representations marred by actual conflicts of interest exude the egregious and readily apparent divided loyalty of counsel, the circumstances where we have found an actual conflict have typically been limited to "[1] where an attorney represents codefendants with inconsistent or contradictory lines of defense; [2] where an attorney or an associate maintains an attorney-client or direct and close personal relationship with a material prosecution witness; or [3] where an attorney has business [or personal] reasons for preferring a verdict unfavorable to the defendant he or she represents."  Mosher, 455 Mass. at 820, quoting Walter, 396 Mass. at 554-555.  Actual conflicts are present in these situations because they epitomize the facial repugnance of an attorney's divided loyalty, which places an unmistakable stain on the attorney-client relationship.  See Mosher, supra at 819. These limited categories also stand in stark contrast to the multitude of situations that may give rise to a potential conflict of interest.  Id. at 823.  Because a potential conflict of interest involves a more tenuous conflict, a defendant's conviction "will not be reversed except upon a showing of

---

[10] In this opinion, we use the 2015 version of Massachusetts Rules of Professional Conduct, even though they were not in effect at the time the events at issue in this case took place, where changes to the rules are not material to our analysis.

material prejudice." Shraiar, 397 Mass. at 20.

The defendant carries the burden of proving both the existence and precise character of the alleged conflict of interest. See Walter, 396 Mass. at 554; Soffen, 377 Mass. at 437. To satisfy this burden, we require "demonstrative proof detailing both the existence and the precise character of this alleged conflict of interest; we will not infer a conflict based on mere conjecture or speculation." Commonwealth v. Stote, 456 Mass. 213, 218 (2010), quoting Shraiar, 397 Mass. at 20. We look to the attendant facts and circumstances surrounding the claimed actual conflict. See Commonwealth v. Martinez, 425 Mass. 382, 392 (1997) (consideration of all facts concerning defendant's claim of conflict including attorney's relationship with prosecution witness, ethical problems, and undenied allegations of broken client confidence). There is no substitute for meeting this burden other than sufficient, concrete evidence demonstrating an attorney's divided loyalty such that prejudice is inherent in the representation. For this reason, we have never held that a defendant can establish an actual conflict of interest by cobbling together a collection of potential conflicts. In determining whether an actual conflict exists, we do not consider potential conflicts in the aggregate, even in a representation plagued by potential conflicts; nor do we accept that potential conflicts have a synergistic effect

that can result in the creation of an actual conflict.

The circumstances surrounding Cousin's claim that White had an actual conflict involve what appear to be, at first glance, a morass of factually similar cases, obscured connections between attorney-client relationships, and a thread of disturbing allegations of police misconduct. Our review of the record reveals that these connections are in fact discretely compartmentalized aspects of unrelated cases. Although the circumstances in this case, as they were developed at the hearing on the motion for a new trial, do not amount to an actual conflict, White's representation of Cousin nonetheless presents troubling issues that may constitute a potential conflict of interest. However, we do not address the issue of a potential conflict because the only issue that was considered at the hearing on the motion for a new trial was whether there was an actual conflict.[11]

b. White's involvement in the Drumgold case. The focal point of the judge's decision that White had an actual conflict was his involvement in the Drumgold civil rights lawsuit. The judge construed White's involvement as embodying two problematic

---

[11] On remand, there is an opportunity for additional evidentiary hearings to determine whether there was a potential conflict of interest, and whether Cousin was prejudiced thereby.

components: (1) White's overlapping representation of Callahan;[12] and (2) White's economic and personal interest in maintaining a professional relationship with the city, the entity that paid White's legal fees in the Drumgold case. We review each issue in turn.

i. The Callahan representation. The judge's conclusion that there was a substantial risk that White's loyalty may have been divided between Callahan and Cousin was based on her view that, "[t]o vigorously defend Cousin, White would necessarily have to take a position that was not in the interest of his client Callahan in the Drumgold [F]ederal suit . . . ." This conclusion assumed that the Drumgold and Cousin cases were inextricably intertwined to the point where there were competing interests, such that White would be inhibited from zealously representing Cousin.

As a threshold matter, in considering an alleged actual conflict stemming from an attorney's simultaneous representation of multiple clients who are not codefendants, the presence of an actual conflict has generally been limited to situations where the defendant's trial counsel simultaneously represents a prosecution witness who testifies against the defendant. See

---

[12] The claims against the detective in the Drumgold Federal civil rights lawsuit had been dismissed well before Cousin's second criminal trial. Therefore, the judge did not find, and Cousin does not argue, that White's prior representation of that detective created an actual conflict.

<u>Mosher</u>, 455 Mass. at 820, and cases cited.  In these circumstances, the conflict is clear; the prospect of defense counsel's cross-examination of a prosecution witness who is also counsel's client almost inevitably "inhibit[s] defense counsel from conducting vigorous cross-examination of the witness, or inhibit[s] defense counsel from pursuing certain avenues of inquiry through that witness, or tempt[s] counsel to disclose client confidences."  <u>Commonwealth</u> v. <u>Patterson</u>, 432 Mass. 767, 776 (2000), <u>S.C.</u>, 445 Mass. 626 (2005), overruled on another ground by <u>Commonwealth</u> v. <u>Britt</u>, 465 Mass. 87 (2013).  In the present case, Callahan was neither involved in the investigation of Cousin nor called to testify as a prosecution witness at Cousin's trial.  In this respect, the alleged conflict concerning White's representation of Callahan in the <u>Drumgold</u> case falls well outside our established actual conflict paradigm.  See <u>Mosher</u>, <u>supra</u> at 820.[13]

Cousin endeavors to recast the circumstances of his case

_____

[13] In the context of a simultaneous representation:

> [W]e have found an actual conflict only where (1) at the time of trial, the defense attorney continued to represent a prosecution witness who furnished material testimony concerning a critical issue in the case against the defendant; or (2) the defense attorney had previously represented a prosecution witness in a matter related to the defendant's criminal case who furnished material testimony concerning a critical issue in the case against the defendant.

<u>Commonwealth</u> v. <u>Mosher</u>, 455 Mass. 811, 820 (2010).

and the underlying criminal case in the <u>Drumgold</u> litigation to create the appearance that these cases are so interrelated that White's loyalty was inherently divided.  Cousin's argument is that White had an actual conflict in representing a BPD officer in the homicide division accused of police misconduct in the course of an investigation and, at the same time, representing a criminal defendant who sought to impugn the investigatory conduct of the BPD officers who investigated his case.  This proposition does not establish an actual conflict, although it may constitute a potential conflict.

In analyzing Cousin's claim that White was saddled by a conflict of interest due to an overlapping representation, our analysis is aided by Mass. R. Prof. C. 1.7.  See <u>Mosher</u>, 455 Mass. at 820 n.19.  With limited exceptions, rule 1.7 prohibits an attorney from representing a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest occurs where "(1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  Mass. R. Prof. C. 1.7 (a) (1), (2).  Cousin does not contend, and the record does not indicate, that White's representation of Callahan was

directly adverse to Cousin.  Accordingly, we need only determine whether White's overlapping representations of Callahan and Cousin posed a significant risk that White would be materially limited in representing Cousin.  See Mass. R. Prof. C. 1.7 (a) (2).

The concern reflected in Mass. R. Prof. C. 1.7 (a) (2) is that an attorney's duty to another client may materially limit the defendant's representation by inhibiting attorney's ability to "consider, recommend or carry out an appropriate course of action for the client."  Mass. R. Prof. C. 1.7 comment 8.  To determine whether there is a significant risk that the attorney is materially limited, "[t]he critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client."  Id.  An attorney may be materially limited "by having acquired privileged information which inhibits him in his representation of the defendant."  Soffen, 377 Mass. at 438.  See Mass. R. Prof. C. 1.7.

The Drumgold and Cousin criminal cases involve the tragic shooting deaths of children.  The BPD homicide division investigated both cases.  Each case also involved claims of misconduct against the BPD officers who investigated the

killings, and both cases received significant media coverage. Described in these broad brush strokes, Cousin advances the judge's theory that a zealous representation of Cousin required an attack on the BPD homicide division, which was inconsistent with Callahan's interests, a BPD officer accused of misconduct in an unrelated civil case. Under the lens with which we analyze the claimed actual conflict, however, the differences between the cases are significantly more telling than their apparent similarities.

The record before this court establishes that Callahan was not involved in the investigation or prosecution of Cousin. Moreover, there is no connection between the allegations of police misconduct in those cases. Cousin claims that Detective Keeler conducted a coercive interrogation of McAfee, the individual who eventually implicated Cousin in the shooting and, as detailed above, failed to reveal exculpatory evidence that McAfee provided. Beyond Detective Keeler's conduct, Cousin also points to the analyst's failure to match fingerprints recovered from the vehicle to Richardson, and McLaughlin's verification of that faulty report. The failure to originally individualize the fingerprints recovered from the vehicle to Richardson precluded Cousin from exploring a viable avenue in his defense.

When White was representing Cousin at his retrial in September, 2009, the claims against Callahan in the Drumgold

case had been significantly narrowed.  A jury already had determined that Callahan was not liable for all civil rights claims other than failing to disclose exculpatory material concerning a key witness.  The Federal District Court judge limited the scope of the Callahan retrial to whether Callahan failed to disclose the fact that the witness was housed in a hotel and provided with meals, that there was promises of favorable treatment in the witness's pending criminal cases and that money was given to him.  Setting aside the fact that the Drumgold case and Cousin's criminal case were unrelated legal actions, Callahan was clearly not facing misconduct claims that remotely resembled Cousin's claims regarding Keeler.

Because Cousin's case and the Drumgold case are unmistakably separate legal actions, involving different BPD officers investigating the killings, and distinguishable claims of police misconduct, a vigorous attack on the police conduct in Cousin's defense would not constitute an attack on all members of BPD's homicide unit.[14]  Moreover, Cousin has failed to produce

---

[14] Were we to accept Cousin's premise, the natural implication would be a prohibition on attorneys representing a police officer in a civil case accused of misconduct and, at the same time, representing a criminal defendant who had been investigated by a different member of the same police department, even if the cases were unrelated and there was no connection between the officer-defendant in the civil case and the other members of that police department who investigated the defendant's case.  This would be an overbroad and imprecise application of our conflict of interest law that would

any evidence from the record suggesting that vigorously defending Cousin would be inconsistent with representing Callahan. We are further persuaded that, based on this record, White's representation of Callahan did not create an actual conflict of interest because there is no indication that White acquired confidential information from Callahan that materially limited his representation of Cousin. See Soffen, 377 Mass. at 437-438. See also Mass. R. Prof. C. 1.7.

ii. White's economic and personal interests. The judge also concluded that White had an actual conflict of interest stemming from his economic and personal interest in the Drumgold litigation. In the judge's view, "White had an economic or personal interest, at the time he represented Cousin, in remaining on good terms with the BPD, thus creating a substantial risk that the manner in which he represented Cousin could materially and adversely be affected." Beyond White's financial compensation for his representation of the individual officers in the Drumgold case, the judge emphasized that, "[a]s the entity that paid the bills, the city was essentially White's largest paying client in the year leading up to Cousin's second trial." On appeal, Cousin endorses this reasoning and further asserts that because the city was White's client, White was

undoubtedly impact the law practice of many attorneys and limit the ability of police officers to hire the attorney of their choice.

restrained from vigorously challenging the investigation in his case because of his professional obligations to the city.

Much like an actual conflict arising from the competing interests of clients, an attorney's own interests can impair his or her independent professional judgment to the point of causing an actual conflict. See Commonwealth v. Perkins, 450 Mass. 834, 852 (2008); Mass. R. Prof. C. 1.7 (a) (2) & comment 1. An attorney's personal interest can amount to an actual conflict of interest in a variety of situations. See, e.g., Hodge, 386 Mass. at 168 (defense counsel's financial incentive "in not antagonizing his firm's client"); Commonwealth v. Crocken, 432 Mass. 266, 273 (2000) ("A lawyer's personal interests surely include his interest in maintaining amicable relations with his relatives, his spouse, and anyone with whom he is comparably intimate"). But see Commonwealth v. Milley, 67 Mass. App. Ct. 685, 689 (2006) (claim that attorney was complicit in hiring scheme to ensure he continued to receive appointments from clerk-magistrate was too speculative and did not show actual conflict with duty to represent defendant).

In the context of an attorney's economic interest in a representation, we have held that an actual conflict exists "where an attorney has business reasons for preferring a verdict unfavorable to the defendant he or she represents" (citation omitted). Mosher, 455 Mass. at 820. However, an attorney's

financial interest in being compensated for providing legal representation, by itself, is generally too attenuated to constitute an actual conflict. We have held that an actual conflict can materialize out of an attorney's financial interest in a representation combined with that attorney's duty of loyalty to another client or a third person. For example, in Hodge, 386 Mass. at 168, trial counsel was burdened by an actual conflict where he was faced with cross-examining a prosecution witness who was, at that time, represented by that attorney's law firm. We held that trial counsel was burdened by an actual conflict caused by his "financial interest in not antagonizing his firm's client by a vigorous cross-examination designed to discredit him, and his duty to consider only [the defendant's] best interest in deciding whether and how to cross-examine" the firm's client. Id. The actual conflict in Hodge did not depend exclusively on trial counsel's financial interest in the representation, but the significant risk that his loyalty would be inherently divided in cross-examining his firm's client. See id.

Cousin has failed to adduce any facts to support his claim that White had an actual conflict because the city paid him to represent Callahan and the detective in the Drumgold case. The fact that White was paid more than $310,000 for his representation, without more, does not provide a basis to

conclude that there was an actual conflict of interest. Furthermore, our conclusion is not altered by White's testimony indicating that he was open to returning to defend Callahan after Cousin's trial concluded, where this prospect, by itself, is also too speculative to conclude that White's personal interest caused him to have a divided loyalty, amounting to an actual conflict. Although White's prospect of future work for the city would certainly be relevant in analyzing a potential conflict claim, without more it is too tangential to constitute an actual conflict.

Cousin's claim that White had an actual conflict because the city was essentially his client is equally unsupported by the record. Significantly, Cousin relies on speculation and conjecture to support his allegation that White was constrained from vigorously defending him through an attack on the alleged police misconduct in Cousin's defense because it could have exposed the BPD, and ultimately the city, to greater liability.[15]

_____

[15] Cousin contends that White admitted during the hearing on the motion for a new trial that he had a conflict of interest. This alleged acknowledgement occurred during an exchange between the judge and White, following White's testimony that he developed a practice of telling all of his criminal clients that he represented a police officer in the Drumgold case. The judge inquired, "Because it could be perceived as a conflict of interest?" White replied that "[i]t would certainly be perceived as a conflict of interest." The context of this exchange, in light of White's multiple repudiations about having an actual conflict, belie Cousin's contention that White conceded the existence of an actual conflict.

In search of support for this proposition, Cousin relies on United States v. Schwarz, 283 F.3d 76, 90-92 (2d Cir. 2002). Schwarz involved a police officer who had been charged with assault. Id. at 80. In that case, the defendant's law firm had entered into a two-year, $10 million retainer agreement with the Policeman's Benevolent Association (PBA) to represent "all police officers in administrative, disciplinary, and criminal matters as well as to provide them with civil legal representation." Id. at 81. The United States Court of Appeals for the Second Circuit determined that at the point the individual who had been assaulted filed a civil lawsuit against the PBA, an actual conflict arose because the PBA's interests diverged from those of the defendant. Id. at 91. There was an actual conflict at that point because the PBA's interest in limiting its liability diverged from the defendant's interest in advancing a defense in which he would implicate another police officer in the assault. Id. Defense counsel's zealous representation of the defendant in the criminal case could have hampered the PBA's defense in the civil suit and, as a result, the defendant's counsel faced an actual conflict between his representation of the defendant, on the one hand, and his professional obligation to the PBA as well as his own personal and financial interest on the other. Id. at 91-92. Cf. Commonwealth v. Wooldridge, 19 Mass. App. Ct. 162, 167-168

(1985) (firm's contract with police association imposed
continuing professional duties on firm's lawyers to former
clients who were members of police association).

The circumstances in Schwarz, particularly the existence of
an agreement that the attorneys in Schwarz represented the PBA
directly, highlight the infirmities in Cousin's claim that White
had an actual conflict due to his relationship with the city.
There is no indication that White represented the city, a police
union, or anyone other than Murphy and Callahan in the Drumgold
case. Indeed, White testified at the hearing on the motion for
a new trial that he only represented Murphy and Callahan in the
Drumgold litigation. Moreover, White testified that he
understood his loyalty was exclusively to the detective and
Callahan.[16] Although White's agreement with the city to
represent the individual officers was not produced at the
hearing on the motion for a new trial, Cousin has failed to put
forth evidence to controvert White's testimony that he only
represented the detective and Callahan. Contrast Schwarz, 283
F.3d at 96 (attorney's firm had $10 million retainer agreement
with PBA to represent all police officers in variety of legal
proceedings).

---

[16] Although White's alleged personal interest in remaining
on good terms with the city is certainly a relevant
consideration in a potential conflict analysis, it is too
ephemeral to amount to an actual conflict.

Similarly, there is no suggestion in the record that White or the city's conduct in the Drumgold case expanded the scope of White's representation beyond the detective and Callahan.[17]  The record is silent concerning what, if any, direction or control the city exerted over White in the course of his involvement in the Drumgold case.  Significantly, no information was developed concerning whether White had acquired confidential information about the city that may have been material to Cousin's defense, particularly his allegations of police misconduct.  Had White acquired confidential information about the city or the BPD that would have materially limited his representation of Cousin and created a concurrent conflict, that likely would have constituted an actual conflict.  See Soffen, 377 Mass. at 437-438.  See also Mass. R. Prof. C. 1.7.  Although this may be a compelling avenue of exploration concerning a claim that there was a potential conflict, based on the record before this court, it does not amount to an actual conflict.  This conclusion applies equally to the premise that White may have been less

---

[17] Cousin has failed to establish that there was an implied attorney-client relationship between White and the city.  See Bays v. Theran, 418 Mass. 685, 690 (1994) ("attorney-client relationship may be implied when [1] a person seeks advice or assistance from an attorney, [2] the advice or assistance sought pertains to matters within the attorney's professional competence, and [3] the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance" [quotations and citation omitted]).  Although the record before this court is undeveloped in this respect, it could be an area of relevant consideration in a potential conflict analysis.

than vigorous in defending Cousin because White wanted to maintain an amicable relationship with the city and not expose the city to greater liability in the Drumgold case. It is clear from the dearth of information in the record that Cousin has failed to carry his burden of proving that White had an actual conflict as a result of his involvement in the Drumgold litigation or his relationship to the city.

c. Robinson's representation of McLaughlin. In determining that White was burdened by an actual conflict, the judge considered, at least in part, Robinson's representation of McLaughlin, one of the fingerprint analysts in Cousin's case. Robinson defended McLaughlin, in the Cowans case, while White and Robinson were law partners at DRW, against a claim that McLaughlin had concealed an erroneous fingerprint match that had implicated Cowans in a shooting. Cousin contends that White continued to owe a duty of loyalty to his former partner's past client that prohibited White from representing Cousin, thus amounting to an actual conflict. We discern no such conflict.

At the outset, it is uncontroverted that neither White nor Robinson was representing McLaughlin at the time of Cousin's trial. Robinson's representation of McLaughlin ended in September, 2007, when the Cowans case settled. White left DRW in 2007 and began his own firm, White & Associates. He filed his notice of appearance on behalf of Cousin approximately one

year later, on October 22, 2008.  Significantly, McLaughlin was never identified as a witness for the Commonwealth and she did not testify at Cousin's first or second trials, which began in September, 2009.  White never confronted the prospect of cross-examining his former partner's past client in defending Cousin.

Even were we to assume that McLaughlin may have testified as a prosecution witness against Cousin, despite her no longer being a member of the latent fingerprint unit, we have generally held that terminating that conflicting representation prior to the defendant's trial "obviat[es] the risk of simultaneous representation."  Martinez, 425 Mass. at 389.  Because Robinson's representation of McLaughlin ended approximately two years before Cousin's trial, White was not burdened by an actual conflict.  See Mosher, 455 Mass. at 821-823 (no actual conflict resulted from representation terminated one month prior to trial); Patterson, 432 Mass. at 775-776 (no actual conflict resulted from previously terminated representation); Fogarty, 419 Mass. at 459-460 (no conflict where defense counsel's associate ended representation of prosecution witness prior to defendant's retaining defense counsel); Commonwealth v. Smith, 362 Mass. 782, 783-784 (1973) (no conflict where defense counsel's representation of prosecution witness ended before defendant's trial commenced).

The fact that neither White nor Robinson was representing

McLaughlin at the time of Cousin's trial does not end our inquiry concerning whether White had a surviving duty of loyalty to McLaughlin that would have impeded him from vigorously representing Cousin.  To resolve this issue, we are guided by Mass. R. Prof. C. 1.9, as appearing in 471 Mass. 1359 (2015), which traces the contours of an attorney's duty of loyalty to former clients.  Rule 1.9 prohibits an attorney from representing clients whose interests are adverse to a former client, particularly where that former client's confidential information may be at issue in the subsequent representation.  See Mass. R. Prof. C. 1.9 (a).

An attorney who leaves a law firm to take a position at another law firm may have a continuing duty of loyalty to his or her former firm's past clients.  Mass. R. Prof. C. 1.9 (b).  That attorney is prohibited from representing a person in the same or a substantially related matter in which their former firm had represented a client where (1) that person's interests are materially adverse to the former client, and (2) the attorney acquired protected confidential information from the former client that is material to that person's case.  Mass. R. Prof. C. 1.9 (b) (1), (2).  This prohibition "operates to disqualify the lawyer only when the lawyer involved has actual knowledge of information protected by Rules 1.6 and 1.9(c)."  Mass. R. Prof. C. 1.9 comment 5.  If the attorney did not

acquire knowledge about the former firm's client, and that attorney joins another firm, "neither the lawyer individually nor the second firm is disqualified from representing another client in the same or a related matter even though the interests of the two clients conflict." Id.

Although McLaughlin was a past client of White's prior law firm, White testified at the hearing on the motion for a new trial that he was uninvolved in Robinson's representation of McLaughlin, and he did not acquire any confidential information about McLaughlin. There is nothing in the record that contradicts White's testimony that the partners at DRW generally handled their cases independently. To the extent that White and his law partners at DRW discussed cases generally, the record is insufficiently developed to support an inference that general discussion about cases indicates that White acquired confidential information about McLaughlin from Robinson.[18] There was no indication that White was restrained from challenging McLaughlin's work as a fingerprint analyst in Cousin's case.[19]

---

[18] This type of informal discussion of cases, depending on their content and whether confidential information was discussed, would be a relevant inquiry in a potential conflict analysis.

[19] The difference between the allegations of misconduct against McLaughlin in this case compared to the Cowans case is also significant. In the Cowans case, McLaughlin was accused of concealing the discovery that a fingerprint recovered from the crime scene was erroneously matched to Cowans, thus implicating

Furthermore, a telephone conversation that Robinson coordinated between White and McLaughlin does not change our view that there is insufficient evidence to establish an actual conflict on these grounds.  White testified that in the course of preparing for Cousin's trial, and in response to the report that the originally analyzed and unmatched fingerprints actually had a match, White attempted to contact McLaughlin.  Robinson facilitated the telephone call between White and McLaughlin after White mentioned, in the course of having lunch with Robinson, that he was preparing for Cousin's criminal trial and he had been unable to contact McLaughlin.  White spoke with McLaughlin in private, and Robinson was not present for the conversation.  Significantly, White testified that he did not acquire any confidential information about McLaughlin during that telephone call, and there is nothing in the record to indicate that White gleaned any confidential information during that conversation, which he described as brief and "not . . . terribly productive."  Accordingly, Cousin fails to set forth any information suggesting that White acquired confidential

an apparently innocent individual in a crime.  Here, the evidence indicates that McLaughlin verified another analyst's fingerprint analysis, in which that analyst evidently failed to individualize a latent print to an individual who was presumably in the fingerprint database.  With no view on whether this constituted negligence, misconduct, or neither, it is nonetheless clear here that the allegations against McLaughlin in the two cases have no connection that would inhibit White from attacking McLaughlin's work in defending Cousin.

information, either before or during this telephone call, that triggers the prohibitions prescribed in rule 1.9 (b). The mere fact that Robinson put White in contact with her former client in no way subverts that proposition.[20]

3. <u>Conclusion</u>. Based on the foregoing, we discern that there was insufficient evidence to establish that White was burdened by an actual conflict. We vacate the judge's decision granting Cousin's motion for a new trial and remand the case to the Superior Court for further evidentiary hearings on whether Cousin was prejudiced by potential conflicts of interest.

<u>So ordered</u>.

---

[20] The record is equally devoid of evidence that Robinson's representation of McLaughlin arose from an underlying, contractual referral relationship between the city or the Boston police patrolmen's union and Robinson and White. This is not altered by White's brief testimony indicating that Robinson knew the attorney for the patrolmen's union.